Philippe Z. Selendy*
Jennifer M. Selendy*
Daniel P. Mach*
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Phone: (212) 849-7000
Fax: (212) 849-7100
philippeselendy@quinnemanuel.com
jenniferselendy@quinnemanuel.com
danielmach@quinnemanuel.com
*Attorneys for Plaintiffs*
*Applications for Admission *Pro Hac
Vice* Pending

Michael J. Uda
UDA LAW FIRM, PC
7 West 6th Avenue
Power Block West, Suite 4H
Helena, MT 59601
Phone: (406) 457-5311
Fax: (406) 447-4255
michaeluda@udalaw.com
*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA

|  |  |
|---|---|
| Bear Gulch Solar, LLC, Canyon Creek Solar, LLC, Couch Solar, LLC, Fox Farm Solar, LLC, Glass Solar, LLC, LLC, Malt Solar, LLC, Martin Solar, LLC, Middle Solar, LLC, River Solar, LLC, Sage Creek Solar, LLC, Sypes Canyon Solar, LLC, Valley View Solar, LLC, Ulm Solar, LLC, Cypress Creek Renewables Development, LLC,<br><br>    Plaintiffs,<br><br>  vs.<br><br>Montana Public Service Commission and Bob Lake, Travis Kavulla, Brad Johnson, Roger Koopman, and Tony O'Donnell, in their official capacities as Commissioners,<br><br>    Defendants. | CV _____<br><br><br><br>COMPLAINT |

Plaintiffs Bear Gulch Solar, LLC, Canyon Creek Solar, LLC, Couch Solar, LLC, Fox Farm Solar, LLC, Glass Solar, LLC, Malt Solar, LLC, Martin Solar, LLC, Middle Solar, LLC, River Solar, LLC, Sage Creek Solar, LLC, Sypes Canyon Solar, LLC, Valley View Solar, LLC, Ulm Solar, LLC (collectively, "QF Plaintiffs"), and Cypress Creek Renewables Development, LLC ("CCRD" and, collectively with the QF Plaintiffs, "Plaintiffs"), who are all developers of solar energy facilities in the state of Montana, allege as follows:

## SUMMARY OF ACTION

1.     This is an enforcement action pursuant to Section 210 of the Public Utility Regulatory Policies Act ("PURPA"), 16 U.S.C. § 824a-3, against Defendants Montana Public Service Commission ("MPSC") and its individual Commissioners in their official capacity (collectively, "Defendants") resulting from their conduct in violation of PURPA and the Federal Energy Regulatory Commission ("FERC")'s PURPA regulations.  If allowed to stand, Defendants' violations of PURPA will result in substantial economic damage to Plaintiffs and to other solar power project developers in Montana.

2.     Specifically, Defendants have violated Plaintiffs' rights under PURPA to sell their output to their interconnecting utility in Montana, NorthWestern Corporation d/b/a NorthWestern Energy ("NorthWestern"), at the applicable tariff rates in effect when the QF Plaintiffs unequivocally committed to sell such output to NorthWestern.

1

Plaintiffs are developers of solar "Qualifying Facilities" ("QFs")—small power producers meeting certain statutory requirements—to whom PURPA gives a right to sell energy to utilities at the utilities' avoided cost of conventional generation. PURPA further requires that state energy regulators like Defendants recognize that, where a QF unequivocally commits to sell its output to a utility, it establishes a "Legally Enforceable Obligation" on the part of the QF to sell, and on the part of the utility to purchase, the QF's output at a price set at the utility's avoided-cost rate, calculated at the time the obligation is incurred.

3. Defendants have disregarded and violated this federal mandate through a series of orders that prevent the QF Plaintiffs from contracting to sell the output of their planned solar facilities at rates approved by Defendants and in effect until June 16, 2016 (referred to herein as the "Prior QF-1 Tariff"), despite the QF Plaintiffs' unequivocal commitment to sell energy to NorthWestern at those rates prior to that date.

4. On June 16, 2016, the MPSC suspended the Prior QF-1 Tariff, and the Commission has since adopted a new avoided-cost tariff at approximately half the prior rate. Before this rate change, the QF Plaintiffs had fully committed to sell their output to NorthWestern, creating their Legally Enforceable Obligation to sell—and NorthWestern's statutory obligation to purchase—and setting the sale price at the Prior QF-1 Tariff's rate. Indeed, NorthWestern itself acknowledged to the MPSC that it was obligated under federal law to enter into long-term contracts with the QF Plaintiffs

2

under the Prior QF-1 Tariff and that it had committed to Plaintiffs to do so. Yet, in a series of proceedings and orders culminating in a November 24, 2017 final order, Defendants refused to approve the QF Plaintiffs' renewable energy sales to NorthWestern at the Prior QF-1 Tariff rate.

5.     Defendants' grounds for refusing to approve Plaintiffs' agreements to sell to NorthWestern at the Prior QF-1 Tariff rate violate PURPA and FERC regulations implementing the statute. PURPA and FERC's implementing regulations hold that a QF's Legally Enforceable Obligation to sell is incurred, and the avoided-cost price is calculated, at the time when the *QF* commits to sell its output. In 2010 the MPSC had ruled, *In the Matter of Whitehall Wind* ("*Whitehall Wind*"), that no Legally Enforceable Obligation exists until the QF tenders a signed Power Purchase Agreement *and* a signed Interconnection Agreement. This *Whitehall Wind* test purportedly allowed the *utility* to unilaterally delay or otherwise manipulate the process by which a Legally Enforceable Obligation is incurred by a QF, by (among other things) withholding studies necessary to the execution of an Interconnection Agreement. For this reason, the 2010 *Whitehall Wind* standard is wholly inconsistent with both the letter and spirit of PURPA and its implementing regulations.

6.     On June 16, 2016, the MPSC adopted the same legally deficient *Whitehall Wind* test in its order suspending the Prior QF-1 Tariff, ruling that only QFs with signed Power Purchase and Interconnection Agreements as of June 16, 2016 may sell power at

the avoided-cost rate in place until that date. This stated exception to the MPSC's otherwise-wholesale suspension of the Prior QF-1 Tariff violates PURPA because it arrogated to NorthWestern the unilateral power to delay the creation of a Legally Enforceable Obligation until after June 16, 2016, preventing solar QFs from securing the avoided-costs rates in effect before then, even if they had already made clear commitments to NorthWestern to sell their output.

7. In relation to Plaintiffs' specific projects, NorthWestern has unilaterally delayed the mutual execution of Power Purchase and Interconnection Agreements, despite NorthWestern's prior express representations that it would purchase energy from the QF Plaintiffs at the rates in effect before the avoided-cost rate was changed. PURPA does not permit a state regulator to give utilities the unilateral ability to obstruct QFs' commitment to sell at the avoided-cost rate in effect when they make such a commitment.

8. While PURPA grants discretion to the states to determine the applicable test for QFs to demonstrate that they have incurred a Legally Enforceable Obligation to sell power, the statute's implementing regulations require that any such test be objectively based on the actions of the QF, so that utilities like NorthWestern cannot take steps to thwart the QF's establishment of its Legally Enforceable Obligation to sell. Under any permissible test properly focused on the objective conduct of QFs, there can be no doubt that the QF Plaintiffs established a Legally Enforceable Obligation and

4

were entitled to sell power at the avoided-cost rate under the Prior QF-1 Tariff. Indeed, NorthWestern repeatedly conceded that it had reached a final (if unsigned) contractual agreement with the QF Plaintiffs prior to June 16, 2016. Counsel for NorthWestern expressly represented, in hearings before the MPSC, that it had reached agreement with the QF Plaintiffs before the Prior QF-1 Tariff rate was suspended. These agreements are sufficient under Montana law to create a contractual right to payment at the agreed Prior QF-1 Tariff rates. Such agreements, therefore, go above and beyond any requirement of PURPA to create a Legally Enforceable Obligations to sell power and to set a QF's avoided-cost rate.

9.     In response to the MPSC rulings, Plaintiff Cypress Creek Renewables Development, LLC's predecessor, FLS Energy, Inc., instituted proceedings before FERC on October 17, 2016 challenging the MPSC's June 16, 2016 and July 25, 2016 orders ruling that the QF Plaintiffs could only benefit from the Prior QF-1 Tariff's avoided-cost rate if their projects had executed Power Purchase and Interconnection Agreements before June 16, 2016. The MPSC and NorthWestern were both parties to the FERC proceeding, and argued in their FERC filings that the *Whitehall Wind* standard was consistent with PURPA. FERC rejected these arguments in a December 15, 2016 Notice of Intent Not To Act And Declaratory Order, holding that both the MPSC's *Whitehall Wind* standard and the MPSC's reliance upon that standard in defining which QFs could benefit from the Prior QF-1 Tariff violate PURPA and

5

FERC's implementing regulations.[1] A true and correct copy of FERC's December 15, 2016 Order is attached hereto as Exhibit 1.

10.     Plaintiffs promptly brought the FERC Declaratory Order to Defendants' attention in a prehearing brief filed on January 16, 2017.[2] However, rather than acting consistently with the FERC decision, Defendants delayed action on the matter for many months and ultimately disregarded the FERC decision in the MPSC's November 24, 2017 final order, thereby giving rise to this dispute. In that final order, the Commission opined that "FERC's declaratory order is advisory only and is non-binding unless and until it is upheld by a federal district court."[3] Plaintiffs therefore bring this action to request that this Court, consistent with its authority and mandate under PURPA, give effect to Defendants' obligations under federal law by enforcing FERC's ruling that Defendants' conduct violates PURPA and ordering Defendants to allow any QFs that tendered fully negotiated, executed Power Purchase Agreements to Northwestern on or before June 16, 2016 to contract with Northwestern on the terms committed and agreed to, including the rates set forth in the Prior QF-1 Tariff.

---

[1] *FLS Energy, Inc.*, 157 FERC 61,211 (2016).

[2] As a party to the FERC proceeding, the MPSC also received notice of the Declaratory Order when it issued on December 15, 2016.

[3] Order No. 7500d, Dkt. D2016.5.39 ¶ 107 (Mont. Pub. Serv. Comm'n served Nov. 24, 2017). A true and correct copy of Order 7500d is attached as Exhibit 7 and incorporated herein by reference.

11.    Plaintiffs accordingly seek a declaratory judgment, consistent with FERC's December 2016 ruling, that: (i) the *Whitehall Wind* test utilized by Defendants for determining QFs' continued eligibility to sell at rates under the Prior QF-1 Tariff violates PURPA and its implementing regulations; (ii) PURPA requires the MPSC to adopt a standard for establishment of a QF's Legally Enforceable Obligation based on objective manifestations of a QF's commitment to sell energy to a utility, and which the utility may not unilaterally obstruct; (iii) PURPA requires that a QF's tendering of a signed, fully negotiated, final Power Purchase Agreement is sufficient but not necessary to establish a Legally Enforceable Obligation; and (iv) PURPA requires that where a QF and utility have reached agreement on the terms of a Power Purchase Agreement sufficient to establish a contractual relationship under Montana state law, that is sufficient but not necessary to establish a Legally Enforceable Obligation.

12.    In addition, Plaintiffs seek permanent injunctive relief directing Defendants to implement PURPA in a lawful manner by adopting a standard for establishment of a Legally Enforceable Obligation that is consistent with PURPA, FERC's December 2016 ruling, and this court's declaratory orders, and directing Defendants to allow any QFs that satisfied that standard on or before June 16, 2016, including the QF Plaintiffs, to contract with and sell their output to NorthWestern under the Prior QF-1 Tariff's avoided-cost rates of approximately $66 per megawatt-hour ("MWhr").

## THE PARTIES

13.   Plaintiffs Bear Gulch Solar, LLC, Canyon Creek Solar, LLC, Couch Solar, LLC, Fox Farm Solar, LLC, Glass Solar, LLC, Malt Solar, LLC, Martin Solar, LLC, Middle Solar, LLC, River Solar, LLC, Sage Creek Solar, LLC, Sypes Canyon Solar, LLC, Valley View Solar, LLC, and Ulm Solar, LLC (collectively, the "QF Plaintiffs"), are North Carolina limited liability companies which have sought to develop solar QFs in Montana. The QF Plaintiffs were owned by FLS Energy, Inc. ("FLS") until April 14, 2017. Each QF Plaintiff seeks: (i) to develop a discrete solar facility in Montana that meets the definition of, and has registered with FERC as, a "qualifying facility" under PURPA, and (ii) to sell the electrical output of such facility to NorthWestern, which is obligated under PURPA to purchase such output at its "avoided cost," as discussed below.

14.   Plaintiff Cypress Creek Renewables Development, LLC ("CCRD") is a Delaware limited liability company with its principal place of business in California. Cypress Creek Holdings, LLC, a Delaware limited liability company with its principal place of business in California, is the 100% parent (through intermediate entities) of Plaintiff CCRD, and acquired FLS on December 23, 2016. On April 14, 2017, FLS conveyed its membership interests in the QF Plaintiffs to CCRD, and accordingly, CCRD is the successor-in-interest to FLS in its capacity as current owner of the QF Plaintiffs.

8

15.     Defendant MPSC is an agency of the State of Montana required to implement FERC's regulations under PURPA. The MPSC's mailing address is 1701 Prospect Avenue, P.O. Box 202601, Helena, MT 59620-2601.

16.     Defendants Brad Johnson, Travis Kavulla, Tony O'Donnell, [4] Roger Koopman, and Bob Lake are Commissioners of defendant MPSC. Each is sued herein solely in his official capacity as such.

## JURISDICTION AND VENUE

17.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it brings a claim arising under federal law, specifically PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B).

18.     This court has personal jurisdiction over the defendants because each defendant conducts a substantial portion of its or his duties in the District of Montana.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because all or a substantial part of the events giving rise to this action occurred in the District of Montana.

---

[4]  Defendant O'Donnell was elected to the MPSC in November of 2016, after the rate suspension in question, replacing former Commissioner Kirk Bushman.

## STANDING AND EXHAUSTION

20.     Section 210 of PURPA, 16 U.S.C. § 824a-3(h)(2), provides that "[a]ny electric utility, qualifying cogenerator, or qualifying small power producer may petition the Commission to enforce the requirements of [PURPA]. If the Commission does not initiate an enforcement action … against a State regulatory authority or nonregulated electric utility within 60 days following the date on which a petition is filed under this subparagraph with respect to such authority, the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority or nonregulated electric utility to comply with such requirements, and such court may issue such injunctive or other relief as may be appropriate."

21.     The QF Plaintiffs, who are "qualifying small power producers" within the meaning of PURPA, petitioned FERC to enforce PURPA and FERC's implementing regulations on October 17, 2016. On December 15, 2016, FERC issued a Notice of Intent Not to Act And Declaratory Order stating that "the Commission declines to initiate an enforcement action under Section 210(h)(2)(A) of PURPA" but that it "finds that the Montana Commission's legally enforceable obligation standard is inconsistent with PURPA and the Commission's PURPA regulations…." Ex. 1 at 1-2, 11. Plaintiffs have accordingly exhausted their administrative remedies and have standing under PURPA to bring suit.

## LEGAL AND FACTUAL BACKGROUND

**PURPA And FERC's PURPA Regulations**

22.     Congress enacted PURPA in 1978 to reduce the nation's dependence on traditional fossil fuels for electrical energy generation. Section 210 of PURPA sought to accomplish that goal by encouraging the development of non-traditional electricity generating facilities, such as those that use renewable resources.

23.     Congress found that one obstacle to the development of alternative energy projects was the reluctance of traditional electric utilities to do business with such projects, in some cases because utilities owned and operated fossil fuel power generation assets that faced competition from alternative energy projects. In response, Section 210 of PURPA created a new class of "favored cogeneration and small power facilities" in the overall regulatory scheme of the nation's energy markets. PURPA directed FERC to promulgate rules requiring utilities to purchase electric energy from Qualifying Facilities ("QFs"), including a "solar, wind, waste, or geothermal facility" that "has a power production capacity which … is not greater than 80 megawatts." 16 U.S.C. § 796(17)(A).

24.     Under PURPA, Congress gave state regulatory commissions, such as the MPSC, the authority to implement certain elements of the statute in accordance with FERC's PURPA rules. 16 U.S.C. § 824a-3(f), (g). While states' utility commissions are charged with determining the avoided-cost rates at which QFs may sell to utilities,

11

that authority is circumscribed by PURPA's mandates and FERC regulations, including the requirements that: (i) such rates "shall … [n]ot discriminate against [QFs]," 18 C.F.R. § 292.304(a)(1)(ii); *see also* 16 U.S.C. 824a-3(c)(2); 18 C.F.R. § 292.302(b)-(d), and (ii) that "[e]ach electrical utility shall purchase … any energy and capacity which is made available [directly or indirectly] from a qualifying facility," 18 C.F.R. § 292.303(a). In short, state action to implement PURPA must give effect to its Congressionally-mandated statutory purpose and FERC's PURPA regulations, including PURPA's requirement that electric utilities must buy from QFs at rates that comply with applicable FERC regulations. 16 U.S.C. § 824a-3(a)(2).

25. Under PURPA, utilities must purchase electricity from QFs at rates that do not "exceed[] the incremental cost to the electric utility of alternative electric energy." *Id*. § 824a-3(b). That incremental cost is "the cost to the electric utility of the electric energy which, but for the purchase from [the QF], such utility would generate or purchase from another source." *Id.* § 824a-3(d). That cost is commonly referred to as "[a]voided cost." 18 C.F.R. § 292.101(b)(6).

26. FERC's PURPA regulations entitle a QF to select one of two options with respect to how to provide energy to a utility. First, the QF can provide energy on an "as available" basis, at rates based on the utility's avoided cost at the time of delivery. 18 C.F.R. § 292.304(d)(1). Second, the QF may sell its output "pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in

which case the rates for such purchases shall be based, at the option of the qualifying facility exercised prior to the beginning of the specified term, on either: (i) the avoided costs calculated at the time of delivery; or (ii) the avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2).

27.     A Legally Enforceable Obligation (commonly referred to as a "LEO") is an obligation to sell that can arise either under a contract or by operation of law. As explained by FERC, the purpose of the LEO concept is to prevent utilities from circumventing the requirement of PURPA that they purchase from a QF "by refusing to enter into a contract with a qualifying facility." FERC Order No. 69, 45 Fed. Reg. 12214-02, 12224 (1980). In particular, the LEO concept exists to allow QF's to make substantial fixed-cost investments (as the power-generating utilities themselves do) with the certainty of a known fixed rate of compensation. Likewise, and critical to this case, the LEO concept is meant to prevent utilities from denying QFs more favorable avoided-cost pricing by delaying contract execution until a time when avoided-cost rates have been reduced or have declined.

28.     While states have some discretion to determine how a LEO arises under state law, that discretion is subject to the requirement that the LEO standard must be consistent with PURPA and FERC's implementation of the statute.   16 U.S.C. § 824a-3(f), (g). A LEO must arise from a QF's own commitment to sell to the utility, and not from any action of the utility, because it is the *QF* that, by federal law, "shall

13

have the option" to choose to deliver electricity pursuant to a LEO and "at the avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2).

29.     PURPA regulations require that state commissions establish standard rate schedules for QFs with a design capacity of 100 kilowatts ("kW") or less. 18 C.F.R. § 292.304(c)(1). State commissions may establish standard rate schedules for QFs with a design capacity larger than 100 kW. 18 C.F.R. § 292.304(c)(2). Standard rate schedules have two primary purposes: (i) to reduce transaction costs for QFs and utilities alike, as the rates need not be frequently recalculated, and (ii) to promote the development of such smaller QFs by providing them essential business certainty through legally-established rates—the same business certainty that is provided to promote the development of other power generation assets. *See Windham Solar LLC and Allco Fin. Ltd.*, 157 FERC 61,134 ¶ 8 (2016).

30.     State regulatory commissions, such as the MPSC, may not exempt utilities from the obligation to purchase renewable power from QFs, interfere with a QF's right under PURPA to select the manner in which it will sell its output to the utility, or otherwise act or fail to act in a manner inconsistent with PURPA or FERC regulations.

31.     In addition to the must-purchase obligation, PURPA requires electric utilities to provide interconnection with any QF "as may be necessary to accomplish purchases or sales" under PURPA. 18 C.F.R. § 292.303(c)(1). FERC generally considers such interconnections to be under the jurisdiction of the state. As with all

aspects of PURPA implementation, however, the state's actions in this respect must accord with PURPA's Congressionally-enacted mandate and FERC's implementing regulations.

32.     This action arises from Defendants' failure to implement PURPA in a manner consistent with the statute's mandates and FERC's regulations.

**Negotiations Between Plaintiffs And NorthWestern Over Power Purchase Agreements For Plaintiffs' Solar Facilities**

33.     From August 2013 until June 16, 2016, the avoided-cost price at which Montana's QFs were entitled to sell power to NorthWestern was at the utility's MPSC-approved, pre-June 16, 2016 tariff (the "Prior QF-1 Tariff"). Under the Prior QF-1 Tariff, energy delivered to, or contracted for with, NorthWestern was priced at the rate of $66/MWhr. The Prior QF-1 Tariff was available to solar QFs with a nameplate capacity of 3 megawatts ("MW") or less in design capacity.

34.     Beginning in late 2015, the QF Plaintiffs—then owned by FLS, the predecessor-in-interest to Plaintiff CCRD—began to develop small solar facilities throughout the state of Montana in reliance on their rights under PURPA, FERC's implementing Regulations, and the PURPA avoided-cost rates then-prevailing in Montana. These projects were designed with a capacity of 3 MW or less in order to qualify for the avoided-cost rates established and approved by the MPSC in NorthWestern's Prior QF-1 Tariff. Prior to the actions giving rise to this Complaint,

the QF Plaintiffs' then-parent company, FLS, and the QF Plaintiffs expended approximately $750,000 to develop these solar projects.

35. In reliance on its statutory rights and the Prior QF-1 Tariff, FLS approached NorthWestern in February 2016 to obtain Power Purchase Agreements ("PPAs") pursuant to which each of the QF Plaintiffs would sell, and NorthWestern would purchase, the electrical output from its solar generation facility under PURPA. Both FLS and NorthWestern were aware that: (i) later in the year NorthWestern would be seeking the MPSC's approval of updated (and probably lower) avoided-cost rates in a new QF-1 Tariff, and (ii) once those updated rates were approved by the MPSC, the QF Plaintiffs would not qualify for the Prior QF-1 Tariff rates unless they had already entered into PPAs with NorthWestern or otherwise established a Legally Enforceable Obligation under PURPA prior to the MPSC's implementation of the new QF-1 Tariff.

36. Concerned that possible delays in the finalization of PPAs with NorthWestern would prevent the QF Plaintiffs from qualifying for the Prior QF-1 Tariff, on several occasions, FLS's General Counsel sought assurance from NorthWestern that it was not seeking, and would not seek, to delay PPA execution. NorthWestern assured FLS that it would not delay PPA execution to prevent the QF Plaintiffs from qualifying for the Prior QF-1 Tariff.

37. On May 3, 2016, NorthWestern filed its new proposed QF-1 Tariff with the MPSC in which it sought to reduce the avoided-cost rate it paid to solar QFs from

16

approximately \$66/MWh to approximately \$38/MWh, or by approximately 42%.[5] NorthWestern continued to assure FLS that it was not seeking to preclude the QF Plaintiffs—which had been seeking PPAs from NorthWestern for three months—from qualifying for the then-current avoided-cost rates.

38.    Notwithstanding its assurances to FLS, on May 17, 2016, NorthWestern filed an emergency motion with the MPSC requesting a complete suspension of fixed long-term rates for small solar QFs over 100 kW (Option 1(a)),[6] under the Prior QF-1 Tariff.[7]   Nevertheless, despite having filed this motion, NorthWestern again assured FLS, on June 1, 2016, that it would enter into PPAs with all of the QF Plaintiffs at the existing QF-1 Tariff avoided-cost rates.

---

[5] The new QF-1 Tariff finally approved by the MPSC actually reduces NorthWestern's avoided-cost rate to approximately \$31/MWh, or less than 50% of the rate under the Prior QF-1 Tariff. *See* 9th Revised QF-1 Tariff at 2, Dkt. D2016.5.39 (Mont. Pub. Serv. Comm'n approved Aug. 7, 2017). It also reduces PPA length from 25 to 15 years. *See* Ex. 7 ¶ 114.

[6] The MPSC's QF-1 tariffs give QFs the choice of several PPA options that vary in contract length and rate. *See* 8th Revised QF-1 Tariff ("Prior QF-1 Tariff") at 2-3, Dkt. D2012.1.3, Order No. 7199d (Mont. Pub. Serv. Comm'n approved Jan. 14, 2013). All Plaintiffs in this case sought to sell to NorthWestern under Option 1(a).

[7] Absent the extraordinary relief sought by NorthWestern in its emergency motion, the Prior QF-1 Tariff would have remained in effect until the MPSC completed its proceeding (including a full evidentiary hearing) on NorthWestern's May 3rd petition to establish new avoided-cost rates.

39.     FLS relied on NorthWestern's explicit assurances in connection with proceedings relating to the emergency motion.   Specifically, and solely due to NorthWestern's promise to execute the PPA at then-current avoided-cost rates, FLS did not seek to intervene in opposition to the motion, but instead filed comments on June 6, 2016 describing the understanding between FLS and NorthWestern, and stating that FLS would strongly oppose any rate suspension that affected FLS's ability to contract under the PPAs it had already negotiated with NorthWestern.  NorthWestern did not dispute any of FLS's comments in its own submissions to the MPSC.

40.     In the first week of June 2016, FLS and NorthWestern reached final agreement on all material terms of a standard form QF-1 PPA to be utilized by all of the QF Plaintiffs.  FLS unequivocally communicated to NorthWestern that all Plaintiffs were committed to contracting with NorthWestern on the agreed-upon terms, which included the avoided-cost rates established in the Prior QF-1 Tariff.

41.     At the June 9, 2016 hearing on its emergency motion, NorthWestern's counsel orally modified the emergency motion to exclude the QF Plaintiffs from its requested suspension of the Prior QF-1 Tariff.  NorthWestern's counsel acknowledged that it had reached agreement with FLS on the terms and language of the PPAs, and stated that NorthWestern considered itself legally obligated to enter into PPAs with the

QF Plaintiffs at the rates established in the Prior QF-1 Tariff.[8]  A true and correct copy

of excerpts from the transcript of the June 9, 2016 hearing is attached hereto as Exhibit 9.

42.     Specifically, at the hearing an MPSC Staff Attorney, Laura Farkas, made

the following inquiry to NorthWestern counsel John Alke:

> So I'd like to ask about some of the comments filed by FLS, specifically
> on page two.  And I think you probably know what I'm referring to.
> They mentioned the agreement that they have struck with
> NorthWestern.  And I just want to confirm that—and I think you might
> have alluded to this, but I just want to confirm—that that agreement has,
> in fact, been made between NorthWestern and FLS.

43.     Mr. Alke responded as follows:

> Ms. Farkas, there is not a written agreement.  What we have agreed to,
> because we think we are obligated to do it, is where we are in the
> negotiations with FLS is there's been an agreement reached on the
> language of the contracts.  So the negotiation on the contract terms are
> over.  Both parties have indicated they will sign.  We have no choice.
> And they like the terms.  The only thing remaining is execution.  And
> as I said, we do have to make sure, through a final examination of what
> are called the form 556s and the project descriptions, that there's not
> gaming; in other words, that there's not, two 3 megawatt projects at the
> same location.  But other than that, the work has been done.  We can't
> refuse to negotiate.  So what we are recognizing officially, on the record,
> through my representations, is that FLS's representations to you and
> their comments are correct.

---

[8] The MPSC held the hearing on the motion prior to the deadline for intervention in the
proceeding and without notice to other interested parties.  Likewise, the MPSC allowed
NorthWestern to present evidence at the hearing without the opportunity for opposing
parties to meaningfully cross-examine or otherwise challenge NorthWestern's
evidence.

44.     Consistent with the oral agreement that NorthWestern acknowledged had been reached between it and FLS, each QF Plaintiff executed the form PPA that had been agreed to by NorthWestern and FLS on June 15 and 16, 2017, and tendered those executed PPAs to NorthWestern.    These PPAs unequivocally obligated each QF Plaintiff to deliver the electrical output of its facility to NorthWestern and subjected each seller to significant damages for its failure to do so.

45.     The QF Plaintiffs' commitment to deliver energy at the then-in-effect avoided-cost rates in negotiations with NorthWestern gave rise to Legally Enforceable Obligations under PURPA and FERC's implementing regulations, obligating NorthWestern to purchase energy from the QF Plaintiffs at the rates established in the Prior QF-1 Tariff, no later than when FLS tendered those signed and executed PPAs memorializing that commitment.

**The Requirement Of Interconnection Agreements For The QF Plaintiffs' Solar Projects**

46.     Before a solar facility can begin delivering power under a PPA, it must first achieve interconnection with the power grid.    Interconnection can be a lengthy process that can require multiple engineering studies (including a System Impact Study and a Facilities Study) and the construction of new or modified electrical infrastructure to allow the project to safely put its power on the grid.

20

47.     The last step in the interconnection review process prior to the construction of interconnection facilities is the execution of an Interconnection Agreement ("IA") by the project and the utility. The IA is a standard form agreement set forth in an appendix to NorthWestern's MPSC-approved Small Generator Interconnection Procedures ("SGIP"), and its substantive terms are generally not subject to negotiations between the project and the utility. However, an IA cannot be prepared and executed until the scope and price of required interconnection system upgrades has been determined through the Facilities Study so that the interconnection customer's payment obligations and an interconnection schedule can be established.

48.     Although the generator initiates the process and pays all related expenses, 18 C.F.R. § 292.306(a), the engineering studies and construction are work generally performed by (and thus under the control of) the interconnecting utility. Interconnection studies and execution of an Interconnection Agreement relating to the costs and technical requirements of interconnection are typically completed after a generator and the receiving utility complete a PPA governing price terms for the power purchases.

49.     NorthWestern is the interconnecting facility for the QF Plaintiffs' projects. The procedures for achieving interconnection to NorthWestern's grid are set forth in NorthWestern's SGIP, which were approved by the MPSC as Attachment N to NorthWestern's Open Access Transmission Tariff ("OATT"). The MPSC has the power to enforce NorthWestern's compliance with the requirements of the SGIP.

50. At the time it tendered the executed PPAs to NorthWestern, FLS and the QF Plaintiffs could not tender executed Interconnection Agreements to NorthWestern because NorthWestern had not yet provided any of the QF Plaintiffs with final interconnection Facilities Study reports or Interconnection Agreements specifying the interconnection costs that the QF Plaintiffs would be required to pay to NorthWestern.

**The MPSC Suspends The Prior QF-1 Tariff And Adopts Safe Harbor That Permits Utilities To Unilaterally Delay LEO Creation**

51. On June 16, 2016, the MPSC granted NorthWestern's emergency motion, with modifications as set forth in a Notice of Commission Action (the "Suspension Order") issued the same day. A true and correct copy of the Suspension Order is attached as Exhibit 2. The MPSC suspended the Option 1(a) rate of the Prior QF-1 Tariff for solar QFs over 100 kW, effective immediately. The suspension was applicable only with respect to eligible solar QFs; other QFs (including hydro, biomass, waste, and geothermal resources) remained eligible for the existing tariff rate. *See* Ex. 2.

52. Ostensibly to mitigate the impact of the suspension on solar developers who had made substantial investments in Montana in reliance on existing rates, the MPSC provided that "NorthWestern is explicitly authorized, following issuance of this notice, to execute contracts with solar QFs greater than 100 kW, but no larger than 3 MW, at the standard tariff rate, if prior to the date of this notice, the QF had submitted a signed power purchase agreement and executed an interconnection agreement." Ex. 2

at 2. This standard mirrored the standard for establishing a Legally Enforceable Obligation to sell adopted by the MPSC in its 2010 *Whitehall Wind* decision, which held that "[t]o establish a LEO, a QF must tender an executed power purchase agreement to the utility … *and* an executed interconnection agreement." (Emphasis added.)[9] A true and correct copy of the MPSC's *Whitehall Wind* decision is attached as Exhibit 8.

53. On information and belief, no solar project under development by Plaintiffs, FLS, or any other similarly situated developer in Montana was eligible for the exception established in the Suspension Order, because no project that did not already have a signed PPA by June 16, 2016, and a facilities study completed by the utility could tender a signed Interconnection Agreement and thus meet the *Whitehall Wind* test.

**The MPSC Adopts A Safe Harbor Based On A LEO Standard That Is Inconsistent With PURPA, FERC Regulations, And Plaintiffs' Rights**

54. As noted, the Suspension Order allowed a solar QF to retain the Prior QF-1 Tariff's avoided-cost rate in a PPA only "if prior to the date of [the] notice, the QF had submitted a signed power purchase agreement and executed an interconnection

---

[9] *In the Matter of the Petition of Whitehall Wind, LLC, for QF Rate Determination,* Order No. 6444e, Dkt. D2002.8.100 ¶ 47 (Mont. Pub. Serv. Comm'n May 10, 2010) ("*Whitehall Wind*") , *aff'd sub nom., Whitehall Wind, LLC v. Mont. Public Service Comm'n,* 379 Mont. 119 (2015).

agreement." Ex. 2 at 2. This Safe Harbor replicates the LEO test established in the MPSC's prior 2010 decision in *Whitehall Wind*. *See* Ex. 8. As set forth in more detail below, the *Whitehall Wind* standard is inconsistent with PURPA and FERC regulations because it impermissibly permits a utility to control the circumstances in which a QF can establish a LEO.

55.     The problem inherent in the MPSC's *Whitehall Wind* standard is illustrated by the circumstances here. Under that standard, even though the QF Plaintiffs were fully and unequivocally committed to selling the output of their facilities to NorthWestern, as objectively evidenced by their representations to NorthWestern, their execution and tender to NorthWestern of final, signed PPAs, and NorthWestern's representations to the MPSC, they were unable to establish a LEO under the *Whitehall Wind* test before the MPSC suspended the Prior QF-1 Tariff because NorthWestern completely controlled the interconnection study process and the QFs' ability to execute an Interconnection Agreement. However, under PURPA, it is the *QF*, not the utility, that "shall have the option" to choose to deliver electricity pursuant to a LEO and "at the avoided costs calculated at the time the obligation is incurred." 18 C.F.R. § 292.304(d)(2). Contrary to the PURPA requirement that the QF, not the utility, must control its ability to establish a LEO, the *Whitehall Wind* standard impermissibly makes LEO creation the utility's option, by precluding QFs such as the QF Plaintiffs from

establishing a LEO until the utility completes the interconnection study and provides the QF an Interconnection Agreement for signature.

56.     The potential for abuse created by the *Whitehall Wind* standard is further illustrated by NorthWestern's actions in this case. Following the MPSC's June 16, 2016 Suspension Order, NorthWestern refused to negotiate further Interconnection Agreements with the QF Plaintiffs or any other solar QFs. On information and belief, the specific purpose of this refusal was to prevent solar QFs from meeting the *Whitehall Wind* test and establishing LEOs. The effect of this action was to prevent the QF Plaintiffs from establishing LEOs even at the new QF-1 Tariff's avoided-cost rates for over a year, during which time NorthWestern's avoided-cost rates were reduced by another 18%.

57.     NorthWestern's refusal to issue executable Interconnection Agreements to the QF Plaintiffs continued until recently, despite the QF Plaintiffs having met all requirements for issuance of Interconnection Agreements under NorthWestern's interconnection procedures. As of the date of the filing of this Complaint, the QF Plaintiffs have still not received executable Interconnection Agreements from NorthWestern.

58.     FLS brought NorthWestern's refusal to issue Interconnection Agreements to the MPSC's attention on numerous occasions during the avoided-cost proceeding,

including on July 2, 2016 and August 4, 2016. The MPSC took no action to address the problem.

59. FLS filed a motion for rehearing of the MPSC Suspension Order on July 1, 2016. FLS argued, among other things, that the MPSC had held an evidentiary hearing on NorthWestern's emergency motion without giving parties such as FLS adequate notice and an opportunity to participate. The MPSC denied the motion for rehearing on July 7, 2016.

60. On July 25, 2016, the MPSC issued its Final Order confirming the suspension of Option 1(a) rates under the Prior QF-1 Tariff for solar QFs larger than 100 kW ("Order 7500"), a true and correct copy of which is attached as Exhibit 3.[10] Consistent with the MPSC's June 16 Suspension Order, Order 7500 stated that its change to the Prior QF-1 Tariff's avoided-cost rates did "not apply to any QF that had submitted a signed (by the QF) PPA and had signed a final Small Generator Interconnection Agreement on or before June 16, 2016" (the "Safe Harbor"). Ex. 3 ¶ 63. As in the Suspension Order, Order 7500's Safe Harbor requirements were based on the MPSC's *Whitehall Wind* LEO standard. *Id.* ¶ 47. The order thus stated that "this

---

[10] *See* Order No. 7500, Dkt. D2016.5.39 (Mont. Pub. Serv. Comm'n served July 25, 2016). The MPSC issued four subsequent orders, Orders 7500a-d. True and correct copies of these subsequent orders are attached hereto as Exhibits 4, 5, 6, and 7.

standard demonstrates an unequivocal commitment by a QF to deliver energy or capacity, or both, to a utility," such that it would be "reasonable" to exempt from the Tariff Suspension any QF that met the requirements of the test as of June 16, 2016. *Id.*

61.    Commissioner Travis Kavulla dissented from Order 7500. Among other things, his dissent was based on the procedural improprieties in the MPSC's actions (*see* n. 7 and ¶ 59, *supra*) and his view that the MPSC did not have the authority under state law to suspend a rate without conducting a full evidentiary hearing to establish a new rate. *See* Ex. 3, Order 7500, Dissenting Opinion of Travis Kavulla at 2.

62.    On August 8, 2016, FLS filed a motion for reconsideration of Order 7500, arguing that the MPSC's suspension was contrary to PURPA and Montana state law. The MPSC did not hold a hearing on the motion for reconsideration, did not vote on the motion, and did not issue any form of written opinion. By operation of law, the motion was deemed denied on August 18, 2016.

## FERC Rules That *Whitehall Wind* And The MPSC Order 7500 Safe Harbor Requirements Violate PURPA

63.    On October 17, 2016, FLS, as the parent of the QF Plaintiffs, filed a petition under PURPA Section 210(h)(2)(B), 16 U.S.C. § 824a-3(h)(2)(B), requesting that FERC initiate an enforcement action against the MPSC and NorthWestern on the grounds that the MPSC and NorthWestern had failed to implement PURPA in a manner consistent with the statute and FERC regulations, or, in the alternative, to issue a

declaratory order that the MPSC had violated PURPA. The MPSC and NorthWestern were both parties to this proceeding. FLS maintained that the MPSC's suspension of fixed long-term rates under the Prior QF-1 Tariff is contrary to PURPA because, among other things, the Suspension Order relied upon an impermissible standard for evaluating when a QF has established a LEO under PURPA.

64. On December 15, 2016, FERC issued a Notice of Intent Not to Act and Declaratory Order, *FLS Energy, Inc.*, 157 FERC 61,211 (2016) (the "Declaratory Order" attached hereto as Exhibit 1). While declining to take enforcement action against the MPSC, FERC ruled that the MPSC's *Whitehall Wind* LEO standard is inconsistent with PURPA and FERC regulations. *See* Ex. 1 ¶¶ 20-26.

65. As set forth above, FERC's PURPA regulations require that a utility purchase any energy and capacity made available by a QF through a LEO. Under Section 292.304(d) of FERC's regulations, a QF also has the unconditional right to choose whether to sell its power "as available" or pursuant to a LEO at a forecasted avoided-cost rate determined, at the QF's option, either at the time of delivery or at the time that the obligation is incurred. 18 C.F.R. § 292.304(d).

66. The LEO standard established in *Whitehall Wind* (and integral to Order 7500) requires a QF seeking to establish a LEO to tender to the utility both a signed PPA *and* a signed, final Interconnection Agreement. *See* Ex. 3 ¶ 47. It is not possible,

however, for a QF to tender a signed Interconnection Agreement until the utility completes its feasibility study and proposes the terms of the Interconnection Agreement.

67.     FERC observed in the Declaratory Order that under established Commission precedent, requiring a QF to have a utility-executed contract such as a PPA in order to establish a LEO is inconsistent with PURPA and FERC regulations. In so ruling, FERC referred to its prior decision in *Cedar Creek Wind, LLC*, 137 FERC 61,006 (2011). There, FERC declared that a "requirement [that] made a fully-executed contract a condition precedent to the creation of a legally enforceable obligation [was] inconsistent with PURPA." *Id.* ¶¶ 35-36. FERC held, in the FLS Declaratory Order, that this case was "particularly instructive," explaining that:

> because the utility can, for example, delay the facilities study and the tendering to the QF of an executable interconnection agreement, the requirement of an executed interconnection agreement imposed by the [MPSC] is no different than requiring a utility-signed contract before the QF can establish a legally enforceable obligation.

*FLS Energy, Inc.*, 157 FERC 61,211 ¶¶ 25-26 (2016); Ex. 1 ¶¶ 25-26.

68.     FERC concluded that the MPSC's "requiring a signed interconnection agreement is no different than requiring a utility-signed contract, and equally impermissible." *Id.* ¶ 26. In other words, FERC ruled that the MPSC's requirement of a signed Interconnection Agreement impermissibly allows the utility to control whether and when a LEO is established.

**When Plaintiffs Sought Administrative Relief, The MPSC Refused To Correct Its PURPA Violation, Notwithstanding FERC's Ruling That Order 7500 Violated PURPA**

69.     In January 2017, the MPSC conducted an evidentiary hearing on NorthWestern's application for new QF-1 Tariff rates.

70.     In post-hearing submissions, on February 10, 2017, FLS and CCRD (through its affiliate Cypress Creek Renewables, LLC), which was the owner of several other QFs similarly situated to the QF Plaintiffs (the "Cypress Creek QFs"), asked the MPSC to modify Order 7500 to allow the QF Plaintiffs and the Cypress Creek QFs to qualify for the "Safe Harbor" under the Prior QF-1 Tariff suspension. This request was based on: (i) FERC's ruling that the MPSC's *Whitehall Wind* test, which it had used to prevent the QF Plaintiffs and the Cypress Creek QFs from qualifying for the Prior QF-1 Tariff, violates PURPA, and (ii) the fact that these QFs would have established LEOs prior to suspension of the Prior QF-1 Tariff but for the Safe Harbor's incorporation of the impermissible *Whitehall Wind* test for a LEO, including the requirement that a QF tender a signed Interconnection Agreement on or before the suspension date.

71.     The MPSC delayed ruling on this motion until it issued its initial final order in the NorthWestern avoided-cost proceeding on June 22, 2017 (the "June 22 Order").[11]

---

[11] *See* Order No. 7500c ("Final Order 7500c"), Dkt. D2016.5.39 (Mont. Pub. Serv. Comm'n served July 21, 2017). A true and correct copy of Final Order 7500c is attached as Exhibit 6 and incorporated herein by reference. As discussed below, due to

In the June 22 Order, the MPSC declined to modify Order 7500, the *Whitehall Wind* test, or the Safe Harbor's incorporation of that test, notwithstanding FERC's Declaratory Order stating that the *Whitehall Wind* test violated federal law. *See* Ex. 6. Despite FERC's unequivocal ruling on the issue six months earlier, in its order, the MPSC stated that FERC's position on the *Whitehall Wind* test was unclear. The MPSC relied on illogical reasoning, including the statement that "FERC's views on these interconnection matters appear self-contradicting," merely because FERC has separately issued its Orders 2003 and 2006, which, FERC has opined, "fulfill[] the Commission's duty to remedy undue discrimination" because "the purpose of the [rule] is to expedite interconnections." Ex. 6 ¶¶ 89-90. The MPSC's order provided no explanation why FERC's effort to fulfill its duty to avoid discrimination against QF power producers would obviate the MPSC's entirely independent duty to adopt a LEO standard that complies with PURPA Section 210 and FERC's implementing regulations.

72. Nor did the MPSC take any action on NorthWestern's refusal to provide Interconnection Agreements to the QF Plaintiffs, in disregard of NorthWestern's obligations under PURPA and own interconnection procedures.

---

several motions for reconsideration, the final order in the proceeding was not issued until November 24, 2017. *See* Ex. 7 ("Order 7500d").

**Defendants' Public Statements Regarding The MPSC Proceedings Demonstrate Bias Against The Solar Industry And An Effort To Stymie Competition In Energy Markets From Solar QFs**

73.     The MPSC issued a press release touting its decision on June 16, 2016, referring to PURPA as an "ill-conceived federal program."[12] In the June 16 press release, Commissioner Koopman further expressed his distaste for the MPSC's duty to implement PURPA in Montana in stark terms, claiming that "this case underscores the futility of government tampering in the energy marketplace, … Politicians think they know better than the market. This proves once again that they don't."

74.     Although the MPSC took no official action on FLS's August 8, 2016 Motion for Reconsideration of Order 7500, on August 9, 2016, Chairman Johnson penned a widely-published newspaper editorial entitled "Consumers shouldn't have to overpay for an 'energy revolution.'" The editorial was also published on the MPSC's website.[13] In his editorial, Chairman Johnson claimed that "[s]ome corporate solar developers operating in Montana … content with throwing ratepayers under the bus to

---

[12]   Mont. Pub. Serv. Comm'n, *Montana Public Service Commission requires NorthWestern Energy to negotiate solar energy contracts: Montana's consumer advocate concerned with effect current solar energy price has on ratepayers* (June 16, 2016), http://psc.mt.gov/news/pr/2016pr/QF%20suspension%20Release.pdf.

[13]   Brad Johnson, *Consumers shouldn't have to overpay for an "energy revolution"*, Mont. Pub. Serv. Comm'n, http://psc.mt.gov/commissioners/District5/pdf/QF%20 Suspension%20oped.pdf .

boost their own profits," are "cherry picking the states with the highest government-assured rate to do business in," and "crying foul" by challenging the MPSC's suspension of the Prior QF-1 Tariff rates. These statements were made despite the fact that ratepayers in Montana have always had to pay fixed rates to fossil fuel power generators even when the cost of producing that power subsequently falls and "corporate fossil fuel developers" reap greater profits. Indeed, fossil fuel generation assets owned by NorthWestern are subject to guaranteed rates of return and, on information and belief, frequently overearn from ratepayers the rate of return that they nominally are granted.

75.     The MPSC's June 22 Order was clearly designed and intended to kill QF development in Montana. In addition to its unlawful ruling on the question at issue in this action, the MPSC ruled against QFs on every disputed issue, in several cases ignoring the recommendations of its own staff. In particular, the MPSC dramatically slashed the PPA rates available to QFs under the QF-1 Tariff and reduced PPA length from 25 to 10 years (with pricing reset after five years)—a change that had not even been requested by NorthWestern. This action was taken in disregard of Montana law and PURPA's requirement that QF PPAs be of sufficient length to provide the QF a reasonable opportunity to attract capital, *see Windham Solar LLC and Allco Fin. Ltd.*, 157 FERC 61,134 ¶ 8 (2016), and with no supporting evidence in the record.

76.    During the MPSC's work session leading to the June 22 Order, an episode occurred that illustrates the MPSC's hostility towards QFs and PURPA, and its determination to prevent independent solar production in Montana. Commissioner Lake and a member of the MPSC staff were caught on tape discussing the order, apparently under the assumption that their microphones were off. The following is a transcription of a short excerpt of the exchange by Amanda Merfield at Yellowstone Public Radio:

> "Well, I mean just the rate be updated but," the first voice says on the recording, before being cut off. [Commission Staff]
>
> "Are you sure?" a second voice inquires. [Commissioner Lake]
>
> "But it's essentially a five-year rate," the first voice says. "So it's … which is, I mean … It's going to probably kill QF development entirely." [Commission Staff]
>
> "Well, the ten-year might do it if the price doesn't," the second voice says. "And honestly, at this low price, I can't imagine anyone's gonna get into it." [Commissioner Lake]
>
> "No—no one," the first voice agrees. [Commission Staff]
>
> "So it becomes a totally moot point because just dropping the rate that much probably took care of the whole thing," the second voice concedes. [Commissioner Lake][14]

---

[14] Brie Ripley, *Hot Mic Throws Shade On Montana Solar: Interview With Billings Gazette Reporter Tom Lutey*, Montana Public Radio (June 28, 2017), http://mtpr.org/post/hot-mic-throws-shade-montana-solar-interview-billings-gazette-reporter-tom-lutey.

77.    After significant public and legislative criticism of the June 22 Order and several motions for reconsideration, on November 24, 2017 the MPSC issued a modified final order in NorthWestern's avoided-cost proceeding (the "November 24 Order"). *See* Ex. 7 ("Order 7500d"). As noted above, in the November 24 Order, the MPSC stated with respect to the matter giving rise to this action that "FERC's declaratory order is advisory only and is non-binding unless and until it is upheld by a federal district court." Ex. 7 ¶ 107. In addition, in the November 24 Order, the MPSC preserved its dramatic reductions to the QF-1 tariff, which are expected to reduce PPA prices to approximately $31/MWh, as compared to the $66/MWh under the Prior QF-1 Tariff. *See id.* ¶¶ 62-63, 117. The MPSC did soften its unilateral and unlawful reduction of PPA length from 25 to 15 years (as opposed to 10 years with a pricing reset at year five under the June 22 Order). *Compare* Ex. 6 ¶ 134, *with* Ex. 7 ¶ 114. However, even with this change, the reduction in PPA length further adversely affects Plaintiffs' project finances (and those of any other similarly situated parties) if they do not receive the relief requested in this action and are not allowed to contract under the Prior QF-1 Tariff.

78.    Defendants' flagrant disregard of FERC's unambiguous ruling that Order 7500's Safe Harbor and its incorporation of *Whitehall Wind* violate PURPA is part of a broader and continuing pattern of hostility to QFs and PURPA.

## FIRST CLAIM FOR RELIEF

### (Enforcement Action under PURPA Section 210(h) for Declaratory and Injunctive Relief)
### 16 U.S.C. § 824a-3(f)-(h)

79.    Plaintiffs re-allege each of foregoing paragraphs as if set forth in full.

80.    The MPSC's Order 7500, and subsequent Orders 7500a-d, are inconsistent with and violate Plaintiffs' rights as QFs under PURPA and FERC's regulations.

81.    The standard by which the MPSC evaluates whether a QF has established a Legally Enforceable Obligation under PURPA and FERC regulations, and which it used for determining eligibility of solar QFs for the Prior QF-1 Tariff Option 1(a) rate as of the date of the Tariff Suspension, violates PURPA.

82.    Plaintiffs have sustained and will continue to sustain substantial economic injury if the MPSC is not ordered to allow the QF Plaintiffs and other similarly situated QFs to enter into PPAs with NorthWestern at the avoided-cost rates as they existed prior to the unlawful suspension of the Prior QF-1 Tariff in June 2016.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant:

A.    A declaratory judgment, consistent with FERC's December 2016 ruling, that:

i.     the *Whitehall Wind* test utilized by Defendants for determining QFs'
continued eligibility to sell at rates under the Prior QF-1 Tariff
violates PURPA and its implementing regulations;

ii.    PURPA requires the MPSC to adopt a standard for establishment of
a QF's Legally Enforceable Obligation based on objective
manifestations of a QF's commitment to sell energy to a utility, and
which the utility may not unilaterally obstruct;

iii.   PURPA requires that a QF's tendering of a signed, fully negotiated,
final Power Purchase Agreement is sufficient but not necessary to
establish a Legally Enforceable Obligation; and

iv.   PURPA requires that where a QF and utility have reached agreement
on the terms of a Power Purchase Agreement sufficient to establish
a contractual relationship under Montana state law, that is sufficient
but not necessary to establish a Legally Enforceable Obligation.

B.    Permanent injunctive relief directing Defendants to implement PURPA in
a lawful manner by adopting a standard for establishment of a Legally
Enforceable Obligation that is consistent with PURPA, FERC's December
2016 ruling, and this court's declaratory orders, and directing Defendants
to allow any QFs that satisfied that standard on or before June 16, 2016,
including the QF Plaintiffs, to contract with and sell their output to

NorthWestern under the Prior QF-1 Tariff's avoided-cost rates of approximately $66/MWhr.

C.    All attorneys' fees, costs, and interest available under law and equity; and

D.    Such further relief as the Court deems just, equitable, and reasonable.

DATED:   New York, New York  
           January 12, 2018

**QUINN EMANUEL URQUHART &**  
**SULLIVAN, LLP**

By: _____

Philippe Z. Selendy  
(philippeselendy@quinnemanuel.com)  
Jennifer M. Selendy  
(jenniferselendy@quinnemanuel.com)  
Daniel P. Mach  
(danielmach@quinnemanuel.com)  
51 Madison Avenue, 22nd Floor  
New York, New York 10010-1601  
Telephone: (212) 849-7000  
Fax: (212) 849-7100

DATED:   Helena, Montana  
           January 12, 2018

**UDA LAW FIRM, PC**

By: _____

Michael J. Uda  
(michaeluda@udalaw.com)  
7 West 6th Avenue  
Power Block West, Suite 4H  
Helena, Montana 59601  
Telephone: (406) 457-5311  
Fax: (406) 447-4255

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on the 12th day of January, 2018, a true copy of the foregoing was mailed by first-class mail, postage prepaid, addressed as follows:

Michael J. Uda
Uda Law Firm, P.C.
7 West 6th Avenue
Power Block West, Suite 4H Helena,
MT 59601

Justin Kraske
Montana Public Service Commission
1701 Prospect Avenue
P.O. Box 202601 Helena,
MT 59620-2601

Tim Fox
Attorney General of Montana 215
North Sanders Street, 3rd Floor
P.O. Box 201401
Helena, MT 59620-1401

Philippe Z. Selendy
Jennifer M. Selendy
Daniel P. Mach
Quinn Emanuel Urquhart &
Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601

BY _____

Jackie Haskins - Paralegal