# EXHIBIT 7

Service Date: November 24, 2017

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

| | | |
|---|---|---|
| IN THE MATTER OF NorthWestern Energy's | ) | REGULATORY DIVISION |
| Application for Interim and Final Approval of | ) | |
| Revised Tariff No. QF-1, Qualifying Facility | ) | DOCKET NO. D2016.5.39 |
| Power Purchase | ) | ORDER NO. 7500d |

## <u>**ORDER ON RECONSIDERATION**</u>

<u>FOR NORTHWESTERN ENERGY:</u>

John Alke, Attorney at Law, NorthWestern Energy, 208 North Montana Avenue, Suite 205,
Helena, MT 59601

<u>FOR THE INTERVENORS:</u>

Vote Solar / Montana Environmental Information Center
Jenny Harbine, Attorney at Law, Earth Justice, 313 E. Main Street, Bozeman, MT 59703
Aurora Janke, Attorney at Law, Earth Justice, 313 E. Main Street, Bozeman, MT 59703

FLS Energy / Cypress Creek Renewables
Michael J. Uda, Attorney at Law, 7 W. Sixth Av., Power Block West, Suite 421,
Helena, MT 59601

Pacific Northwest Solar, LLC
Ryan R. Shaffer, Meyer, Shaffer & Stepans, PLLP, 305 S. Fourth St. East, Suite 101,
Missoula, MT 59801

Montana Consumer Counsel
Jason T. Brown, P.O. Box 201703, Helena, MT 59620

<u>BEFORE:</u>

Brad Johnson, Chairman
Travis Kavulla, Vice Chairman
Roger Koopman, Commissioner
Bob Lake, Commissioner
Tony O'Donnell, Commissioner

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                    2

<u>COMMISSION STAFF</u>:

Will Rosquist, Administrator, Regulatory Division
Justin Kraske, Administrator, Legal Division
Bob Decker, Policy Bureau Chief
Mike Dalton, Rate Analyst
Neil Templeton, Rate Analyst
Jeremiah Langston, Staff Attorney

## PROCEDURAL HISTORY

1.     On May 3, 2016, NorthWestern Corporation, doing business as NorthWestern Energy ("NWE" or "NorthWestern") filed an *Application for Approval of Avoided Cost Tariff Schedule QF-1* ("Application") with the Montana Public Service Commission ("PSC" or "Commission"). The proposed avoided cost rates apply to Qualifying Facilities ("QF") with a nameplate capacity of three megawatts or less. Standard rates for purchases from QFs are based on NorthWestern's avoided costs, which are reviewed by the Commission, made available to the public, and applicable to all contracts with qualifying facilities which do not choose to negotiate a different rate. Mont. Admin. R. 38.5.1901(2)(j) (2016). In its Application, NorthWestern proposes to decrease the standard rates.

2.     On May 13, 2016, the Commission issued a *Notice of Application and Intervention Deadline* setting June 10, 2016, as the deadline for intervention. On June 17, 2016, the Commission issued a *Notice of Staff Action Granting Intervention* to New Colony Wind, LLC, the Montana Consumer Counsel ("MCC"), FLS Energy ("FLS"), Vote Solar and Montana Environmental Information Center ("VS-MEIC"), and Cypress Creek Renewables ("CCR"). Pacific Northwest Solar ("PNWS") filed a Motion for Late Intervention on August 22, 2016, which was granted by *Notice of Commission Action* on September 23, 2016.

3.     On July 25, 2016, the Commission issued Order No. 7500 addressing NorthWestern's Motion for Emergency Suspension of Tariff Schedule QF-1. On August 4, 2016, VS-MEIC filed a *Motion for Reconsideration* of Order No. 7500. FLS-CCR also filed a *Motion for Reconsideration* on August 8, 2016. On August 25, 2016, the Commission issued a *Notice of Staff Action* denying both *Motions for Reconsideration* by operation of law.

4.     On September 2, 2016, the Commission issued Procedural Order No. 7500a establishing deadlines for discovery, intervenor testimony, identification of additional issues, and rebuttal testimony. Procedural Order No. 7500a established October 26, 2016, as the deadline for the Commission to identify additional issues. The Commission identified two additional issues, maximum contract length and performance standards.

5.     On December 29, 2016, the Commission issued a *Notice of Public Hearing*. Parties filed prehearing memoranda pursuant to the requirements in the procedural order. The Commission held an evidentiary hearing on NorthWestern's Application on January 18, 2017, and also accepted public comment. NorthWestern filed several post-hearing provides on

February 1, 2017, as requested by the Commission during the hearing. Several of the intervenors objected to the contents of the post-hearing provides.

6.      On February 10, 2017, FLS-CCR filed a *Motion for Relief from QF-1 Suspension*. NorthWestern filed a post-hearing brief on February 17, 2017. The intervenor parties filed post-hearing response briefs on March 10, 2017. NorthWestern filed its reply brief on March 24, 2017.

7.      PNWS filed a *Motion for Relief from Order No. 7500* on April 3, 2017. NorthWestern responded to both the FLS-CCR *Motion for Relief from QF-1 Suspension* and the PNWS *Motion for Relief from Order No. 7500*.

8.      The Commission held a work session on June 22, 2017 to discuss and act on NorthWestern's Application. The Commission found good cause existed to extend the deadline to issue a decision by thirty days pursuant to Mont. Code. Ann. § 2-4-623.

9.      On July 7, 2017, WINData, LLC filed a late application for general intervention. The Commission denied WINData, LLC's request on July 20, 2017.

10.     For a more detailed description of the procedural history in this docket, see Order 7500c ¶¶ 1-15.

11.     The Commission issued Final Order 7500c on July 21, 2017. Order 7500c reduces the maximum contract length in the QF-1 tariff from 25 years to 10 years, and requires a rate adjustment to reflect current QF-1 tariff rates at the five-year point in a contract. The Order excludes costs attributable to the potential for future regulation of carbon dioxide emissions from the calculation of avoided costs; QFs retain the rights to any renewable energy credits ("REC") attributed to their projects and may separately negotiate for the sale of RECs. The Order establishes separate rates for solar QFs based on an analysis of the capacity contributed by solar projects according to the methodology adopted by the Southwest Power Pool ("SPP"). The Order continues the use of a proxy method based on a blend of market prices and combined cycle combustion turbine costs to estimate long-run avoided costs. Market price inputs for electricity and natural gas are forecast based on four years of forward market prices, with escalation based on the Energy Information Administration's ("EIA") long-term, fundamentals-based natural gas price forecast. The Order applies the bright-line test established in Whitehall Wind to determine existence of a legally enforceable obligation ("LEO"). *In re the Petition of Whitehall Wind for QF Rate Determination*, Docket. D2002.8.100, Order 6444e (May 18, 2010). The Order also

imposes on NorthWestern a 10-year non-QF resource cost-effectiveness constraint in order to achieve non-discriminatory treatment of QFs, given the reduced contract length.

12.    On July 31, 2017, the Commission received motions for reconsideration of Order 7500c from NorthWestern, FLS and CCR, and PNWS. On August 1, 2017, the Commission received a motion for reconsideration of Order 7500c from VS-MEIC. On August 25, 2017, the Commission received *NorthWestern's Amended Motion for Reconsideration and Clarification*.

13.    On October 5, 2017, the Commission held a work session to discuss the motions for reconsideration. The Commission granted in part and denied in part the various requests for reconsideration as discussed in this Order on Reconsideration. On October 20, 2017, NorthWestern filed a *Motion for Clarification and Brief in Support*.

## DISCUSSION AND FINDINGS OF FACT

Contract Length

14.    FLS-CCR and VS-MEIC request that the Commission reconsider its decision to adopt a maximum contract length of 10 years with a rate adjustment after five years. FLS-CCR, *Joint Motion for Reconsideration of Order 7500c* ("FLS-CCR Recon. Mot."), Jul. 31, 2017; VS-MEIC, *Motion for Reconsideration of Order No. 7500c* ("VS-MEIC Recon. Mot."), Aug. 1, 2017. These parties assert that the Commission's decision in Order 7500c is inconsistent with the law and is not supported by evidence. In addition, they contend that a 10-year contract length negatively affects a QF's ability to obtain project financing.

15.    These parties state that PURPA, as implemented in Order 69 of the Federal Energy Regulatory Commission ("FERC"), requires state commissions to set contract lengths that are long enough to allow QFs "reasonable opportunities to attract capital from potential investors." FLS-CCR Recon. Mot. at 4; VS-MEIC Recon. Mot. at 1. In addition, they note that Montana law states that "long-term contracts . . . must be encouraged in order to enhance the economic feasibility" of QFs. FLS-CCR Recon. Mot. at 4-5; VS-MEIC Recon. Mot. at 1.

16.    FLS-CCR further argues that the Commission's reliance on Mont. Admin. R. 38.5.8202(7) to conclude that "long-term" is understood to mean 10 years is a misinterpretation of the rule, and that the requirement for a five-year rate adjustment violates FERC regulations requiring rates based on avoided costs calculated either at the time of delivery or at the time the obligation is incurred. FLS-CCR Recon. Mot. at 7-8.

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                                    6

17.    VS-MEIC also contests the Commission's reliance on Mont. Admin. R. 38.5.8202(7) to define "long-term" as it pertains to QFs. VS-MEIC Recon. Mot. at 6-7. It argues that the Legislature's rejection, in its 2017 session, of proposed legislation reducing contract length from 25 to 20 years and eliminating the statutory requirement to enhance the economic feasibility of QFs reinforces the argument that the Commission's decision is inconsistent with the meaning of "long-term" in Montana law. *Id.* at 6.

18.    VS-MEIC argues that the requirement for a five-year rate adjustment discriminates against QFs because the requirement does not apply to NorthWestern. In addition, it states that the adoption of a 10-year contract term establishes a far-reaching policy without affording interested parties a reasonable opportunity to participate in the Commission's decision. *Id.* at 10-14.

19.    Regarding evidentiary support for the Commission's decision, FLS-CCR argues that both NorthWestern and MCC advocated for shorter contract lengths to protect ratepayers from forecast risk, but neither offered evidence regarding the impact of shortened contract lengths on the ability of QFs to obtain financing. FLS-CCR Recon. Mot, at 5-7. FLS-CCR argues that the only evidence on such impacts was provided by FLS-CCR and VS-MEIC, whose witnesses testified that shortened contract lengths would not provide QFs with reasonable access to financing. *Id.*

20.    VS-MEIC states that several of the Commission's justifications for a 10-year maximum contract length are not supported by evidence. First, it states that the Commission's reliance on MCC's testimony contradicts the Commission's rejection of MCC's similar testimony in Docket D2015.7.59 (an MDU QF avoided cost docket), wherein the Commission found that a reduction in contract length from 35 to 5-10 years was "excessive." Second, it states that in deferring to forecast risk, the Commission ignores the potential benefits of locking in lower prices over a long-term. In addition, it argues that the uncertainty demonstrated by NorthWestern regarding how financial institutions would respond to a shortened contract length does not satisfy the Commission's obligation to encourage QF development and allow a QF to obtain financing. VS-MEIC Recon. Mot. at 2-5.

21.    VS-MEIC and FLS-CCR both assert that the QF contract length policies of other regulatory commissions do not constitute evidence. FLS-CCR Recon. Mot. at 7; VS-MEIC Recon. Mot. at 7-9. In addition, they assert that elements of the QF contract length policies in the

states of Idaho and North Carolina, which the Commission refers to in Order 7500c, do not support a maximum 10-year contract length. *Id.*

22.     Neither PURPA nor FERC regulations implementing PURPA set a specific contract length requirement for QFs. However, when setting rates for QFs, states must consider "the terms of any contract or other legally enforceable obligation, *including the duration of the obligation*[.]" 18 C.F.R. § 292.304(e)(2)(iii) [emphasis added]. FERC has found that QFs need to be able to enter into contractual commitments based on estimates of future avoided costs that provide certainty with regard to the potential return on investments in qualifying electric generating facilities. Order 69, 45 Fed. Reg. at 12,224. Accordingly, FERC regulations provide QFs the option of selling energy and capacity to public utilities pursuant to contract rates based on estimates of a public utility's avoided cost over the term of the contract. *Id.*; 18 C.F.R. § 292.304(b)(5), (d). FERC has spoken specifically to a QF's legal right to long-term fixed rates under Section 210 of PURPA. *See* JD Wind, 129 FERC ¶ 61,148; *Exelon Wind 1, LLC v. Nelson*, 766 F.3d 380, 404-405 (5th Cir. Sept. 8, 2014).

23.     Montana law also establishes standards for setting QF contract rates and conditions which require the Commission to encourage long-term contracts in order to enhance the economic feasibility of QFs. Mont. Code Ann. § 69-3-604.

24.     The Commission finds persuasive the arguments of FLS-CCR and VS-MEIC that the advocacy of NorthWestern and MCC to shorten contract lengths in this case does not include evidence on how the shortened contract lengths they propose would provide QFs sufficient certainty with regard to the potential return on investment in qualifying generating technologies or enhance the economic feasibility of QFs, as required by PURPA and Montana law. As VS-MEIC points out, "MCC's expert testified that he "d[id not] really know exactly how [shorter contract lengths] either stimulated or stagnated QF development." VS-MEIC Recon. Mot. at 3 (quoting Hr'g Tr. 294: 20-21 (Test. Jaime Stamatson).

25.     In contrast, FLS-CCR and VS-MEIC sponsored expert testimony indicating that contract lengths of less than 15 years would make it difficult to obtain long-term financing or would not make economic sense. VS-MEIC Recon. Mot. at 5; FLS-CCR Recon. Mot. at 5-7. Although this testimony was based primarily on general observations and offered no project-specific examples, it was not challenged or refuted by other parties. As a result, the parties' arguments generally supported a QF contract length of at least 15 years.

26.     "Long-term" is defined in Mont. Admin. R. 38.5.8202(7) as "a time period at least as long as a utility's electricity supply resource planning horizon." "Planning horizon," in turn, means the *longer* of: (a) the longest remaining contract term in a utility's electricity supply resource portfolio; (b) the period of the longest lived electricity supply resource being considered for acquisition; or (c) ten years. Mont. Admin. R. 38.5.8202(7, 8) (2016). Upon further consideration, the Commission finds the record evidence in the case indicates that several contracts in NorthWestern's portfolio expire in 2041, or 23 years from 2018, and one expires in 2042. Northwestern 2015 Electric Supply Procurement Plan, Vol. 1 at 8-14 to 8-18, and Vol. 2 at 35. In addition, NorthWestern testified that the "longest lived electricity supply resource" being contemplated by the utility may be a small-scale hydro project, with a 40-year life, or one of several other gas, wind, and solar projects with lives of 30 years. Test. John Bushnell, Exh. JBB-1, "Annual Nominal Levelized Resource Fixed Costs, $/KW Installed." The span of either metric exceeds that of 38.5.8202(8)(c), or 10 years. Thus, in Order 7500c the Commission applied the shortest of the three metrics in the rule when it adopted a 10-year maximum contract length, which was not consistent with the rule.

27.     In addition, upon further consideration, the Commission finds that Mont. Admin. R. 38.5.8202(7) has limited relevance to the meaning of "long-term" in the context of QF contracts. The Commission's QF rules state, "[a]ll purchases and sales of electric power between a utility and a qualifying facility shall be compatible with the goal of the commission's integrated least cost resource planning and acquisition guidelines." Mont. Admin. R. 38.5.1902(6). QF contracts that comply with the Commission's QF rules and approved methods for determining avoided cost rates align with those goals. The Commission finds persuasive the arguments of FLS-CCR and VS-MEIC that the definition of "long-term" in Mont. Admin. R. 38.5.8202(7) is made in the context of electricity supply resource planning and procurement, and not in the context of requirements for QF contracts, which are addressed in Mont. Admin. R. 38.5.1901 *et seq*. References in the Commission's QF rules to the resource planning rules provide utilities and QFs guidance relevant to contract negotiation, but the Commission finds that they are not designed to control contract length in the context of setting rates. The FERC findings in Order 69 and the regulations adopted therein pertaining to contract length, as well as Montana law governing QFs, provide the applicable standards for setting QF contract lengths.

28.     In its Additional Issues testimony, MCC summarized the contract length policies of several other regulatory commissions. Those policies varied widely, from a minimum of one year for Avista in Washington to 20 years for Rocky Mountain Power in Wyoming. Ex. MCC-2, Additional Issues Testimony of Jaime T. Stamatson, Nov. 9, 2016. The contract lengths for several other utilities fall between these limits, and several of the terms of other states' QF tariffs are further differentiated by other factors, such as price indexing in the later years of contracts.

29.     Upon further consideration, the evidence suggests at least one other regulatory commission has a legislative mandate similar to that found in Mont. Code Ann. § 69-3-604.[1] The requirement to encourage long-term contracts in order to enhance the economic feasibility of QFs is central to the determination of contract length in Montana. In reconsidering to extend the maximum contract length from 10 to 15 years, the Commission finds persuasive North Carolina Utilities Commission's ("NCUC") consideration of the issue of contract length, which resulted in the NCUC's limiting a QF to a maximum of 15 years for the following reasons: the NCUC's decision to adopt this limit is responsive to the same risk to consumers the Commission is attempting to mitigate, it unfolded in a similar biennial ratemaking docket for the purpose of established standard, forecast rates for small projects, and the NCUC is operating under a similar statutory regime to consider contract lengths which "encourage" (Montana) or "stimulate" (North Carolina) QF development.

30.     After further review and based on the findings above, record evidence supports setting a 15-year maximum contract length for standard rate-eligible QFs. A 15-year maximum contract length for standard rate-eligible QFs is reasonable and in the public interest, and appropriately balances QFs' need for certainty with regard to return on investment with the risk to customers from the price forecast error extensively discussed in Final Order 7500c. A 15-year maximum contract length enhances the economic feasibility of QFs consistent with the requirements of Mont. Code Ann. § 69-3-604. In addition, the Commission is persuaded that the requirement for a 5-year rate adjustment based on unknown future avoided cost rates interferes

---

[1] In addition to regulatory commission rules implementing PURPA, North Carolina also has a statute that provides that the terms of a contract between an electric power supplier and a new solar electric facility "shall be of sufficient length to stimulate development of solar energy." *In the Matter of Biennial Determination of Avoided Cost Rates for Electric Utility purchases from Qualifying Facilities – 2014*, Order Setting Avoided Cost Input Parameters, 20 (North Carolina Pub. Utilities Comm'n Dec. 31, 2014) (see N.C. Gen. Stat. § 62-133.8 (2017) ("The terms of any contract entered into between an electric power supplier and a new solar electric facility or new metered solar thermal energy facility shall be of sufficient length to stimulate development of solar energy.").

with a QF's right to a rate based on avoided costs estimated at the time it enters an obligation to deliver energy and capacity over a specified contract term. Therefore, the Commission eliminates this requirement.

Carbon Dioxide Emissions Adjustments

31.    In Order 7500c, the Commission excluded from its determination of avoided cost any cost attributable to the potential for future regulation of carbon dioxide emissions. The Commission found persuasive MCC's testimony that including unknown future costs for carbon dioxide emissions in an avoided cost calculation exposes customers to unnecessary risk.

32.    VS-MEIC argues that the Commission's decision to exclude carbon dioxide emissions-related costs from avoided cost calculations used to set QF-1 rates departs from the Commission's prior decision in Crazy Mountain Wind, wherein the Commission found that avoided carbon costs are a component of avoided energy costs for a carbon-free resource. VS-MEIC Recon. Mot. at 18; *In re the Petition of Crazy Mountain for QF Contract Rates and Conditions*, Or. 7505b (Dec. 22, 2016). VS-MEIC argues that the Commission's decision in Order 7500c fails to calculate avoided energy costs on a non-discriminatory basis and underestimates NorthWestern's full avoided cost. *Id.*

33.    VS-MEIC argues that the Commission's rationale for excluding carbon dioxide emissions-related costs, *i.e.*, changes in the political landscape, is unreasonable and based on speculation because the record lacks evidence of a complete elimination of the future potential of those costs. *Id.* at 19. VS-MEIC argues that NorthWestern has consistently included carbon costs in avoided costs estimates, and that its 2015 Electricity Supply Resource Procurement Plan, which would be the basis for such costs, accounts for uncertainty regarding federal carbon policy. *Id.* In addition, VS-MEIC states that the Commission's Crazy Mountain Wind decision also accounted for uncertainty regarding federal carbon policy while still including carbon dioxide emissions-related costs in the avoided cost calculation for a carbon-free resource. *Id.* at 18.

34.    VS-MEIC argues that the Commission's decision to exclude carbon dioxide emissions-related costs from avoided cost calculations in this case discriminates against QFs that generate emissions-free energy, given the Commission's acceptance of an assumed $21.00 per metric ton emissions cost in the case of NorthWestern's request to acquire hydroelectric

resources. *Id.* at 20, citing *In re NorthWestern's Application for Approval of Hydroelectric Facilities Acquisition*, Docket D2013.12.85, Order 7323k (Sep. 26, 2014). VS-MEIC argues that because NorthWestern's next-planned resource acquisitions are all fossil fuel plants, the Commission's decision to change course by excluding emissions costs from avoided cost calculations in this case benefits future utility resource acquisitions while discriminating against QF resources.

35.     Since it first approved NorthWestern's QF-1 tariff in 1998, the Commission has never included an explicit estimate of potential future carbon dioxide emissions-related costs in avoided cost calculations used to set QF-1 tariff rates. The idea of including estimated future emissions costs in avoided cost calculations arose in Docket D2012.1.3. *In re NorthWestern's Application for Avoided Cost Tariff*, Docket D2012.1.3, Order 7199d ¶ 42–45 (Nov. 2012). In that case, QF intervenors argued that avoided cost calculations should include emissions costs and that QFs should not be required to convey renewable energy credits to NorthWestern. *Id.*

36.     The Commission determined that the QF-1 rate structure, which allowed (and still allows) QFs the option of either retaining or conveying renewable energy attributes, incorporated avoided carbon-emissions costs, was reasonable and not discriminatory. *Id.* ¶ 40–41. Historically, QFs have advocated for the right to control the disposition of any renewable energy attributes of their projects. *Id.* Order 7500c provides for that control. QFs can separately negotiate with NorthWestern, or any other entity, for the sale of renewable energy attributes.

37.     Since the last order changing QF-1 rates was adopted, however, Commission has included the estimated, avoided carbon-emissions costs as part of the avoided-cots projection in its treatment of several recent large, project-specific QF rate decisions pursuant to Mont. Code Ann. § 69-3-603 and non-QF resource evaluations. Or. 7500c ¶ 76. Due to its decision in the hydroelectric resources docket, in succeeding QF litigation, the Commission found that "the carbon dioxide emission price forecast is built into the electricity price forecast" and stood separate and apart from the value a REC would entail. *In re Crazy Mountain, LLC*, Docket D2016.7.56, Order 7505b ¶¶ 58–59 (Jan. 5, 2017).

38.     The Commission is not persuaded there is currently a sufficiently accurate way to forecast an carbon emissions-related price adder that would serve as a proxy for the "increased operational cost of the marginal generating unit dispatched at the Mid-C liquid trading hub" were a particular type of carbon regulation to exist. *Id.* 58. The Commission makes this determination

for three reasons. First, unique uncertainty surrounds future emissions pricing. As the Commission makes clear elsewhere in this Order and in Final Order 7500c, it is wary to commit consumers to long-duration regulatory forecasts of values. For carbon dioxide, in contrast to other inputs to the standard rate avoided cost calculations underlying QF-1 tariff rates, such as future natural gas prices, no regional market price history exists, no regional forward market price information exists, no region-wide emissions regulations exist, and there are no market fundamentals to guide the process of estimating emissions prices over the long term. After years of hypothetical forecasting of this variable and anticipating a national market place to form, an independently variable measure of this cost has not emerged. With each passing month, the Commission's prior forecast seems less, not more, accurate in its forecast. To the degree that relevant jurisdictions are adopting policies designed to abate carbon dioxide emissions, it is apparent to the Commission that they are not putting a direct price on those emissions, such that would lead to the wholesale price effect our adjustment was intended to capture. Second, the Commission anticipated changes in the political landscape that is the basis for a forecast of a carbon price adder associated with environmental regulation in its immediately prior orders that dealt with this phenomenon, *In re Crazy Mountain, LLC*, Docket D2016.7.56, but it has become more apparent still to the Commission that the relevant authority that provided a basis for the nationwide regulation of such emissions is actively seeking to repeal the regulation that could have given rise to a price effect on the wholesale energy market resulting from carbon dioxide. *See* Repeal of Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units, 82 Fed. Reg. 48,035 (proposed Oct. 16, 2017) (to be codified at 40 C.F.R. pt. 60).

39.    Third, pursuant to the Commission's resource planning requirements, NorthWestern will continue to incorporate explicit estimates of future emissions costs in an evaluation of the full range of supply- and demand-side resources available to meet retail supply needs, and the associated costs of preferred resources will continue to inform QF-1 tariff rates. In addition, as information pertaining to state, regional, and federal carbon emissions regulation policies evolves, the associated risks and other implications of such policies can be revisited in future proceedings. To the extent a QF believes federal or state policy will result in monetized emissions costs in the near future, the QF has the option, under the approved QF-1 tariff

structure, to sell its energy and capacity under a short-term contract and re-contract after the monetized emissions costs are reflected in subsequent tariff rates.

Solar Capacity Contribution

40.    VS-MEIC and FLS-CCR request that the Commission reconsider its decision to assign a capacity contribution factor of 6.1% to solar generating facilities in the calculation of avoided costs. VS-MEIC argues that the Commission's assigned capacity contribution factor is an extreme and unsupportable outlier in the region, fails to recognize solar output during the majority of on-peak hours, ignores evidence of peak aggregate loads within NorthWestern's balancing area, and fails to consider the aggregate capacity of wind and solar QFs on NorthWestern's system. VS-MEIC Recon. Mot. at 21-22. FLS-CCR incorporated these same arguments in its motion for reconsideration by reference. FLS-CCR Recon. Mot. at 1-2, 9-10.

41.    VS-MEIC argues that, while the Commission has set rates that pay QFs for capacity in 2,038 on-peak hours, the Commission's calculation of the capacity contribution of solar resources ignores the majority of these hours. VS-MEIC Recon. Mot. at 22-23. VS-MEIC states that, in relying on a peak-load month version of the SPP method, the Commission effectively assigns a capacity contribution of zero to four of the five months in the peak-load period. *Id.* at 23-24. VS-MEIC contends that monthly capacity values based on the 60% exceedance level used in the SPP method are 0 MW in January, February, and December, 2.4 MW in July, and 2.3 MW in August, which average to 0.94 MW, or 36%, of the modeled solar facility's 2.612 MW maximum output. *Id.*

42.    VS-MEIC argues that the Commission erred in finding that capacity contribution values used by other utilities "are insufficiently supported by record evidence regarding the rationale, theory, or methodologies that underlie them." *Id.*, citing Order 7500c, ¶ 59. VS-MEIC argues that its testimony documents the predominance of capacity contributions based on a facility's capacity factor in designated on-peak hours and explains the California ISO's use of a 70% exceedance measure applied to 1,825 annual on-peak hours. *Id.* at 25-26. VS-MEIC argues that because NorthWestern's load peaks in both summer and winter, the Commission erred in finding that the contribution of solar resources on NorthWestern's system differs from the contribution on other utilities' systems because those utilities peak in summer. It also points to

evidence that NorthWestern's balancing area load is projected to peak in summer. *Id*. at 28-29; DR VS-011(d); Ex. VS-1, R. Thomas Beach Dir. Test. at 24-25.

43.     VS-MEIC states the Commission erred by ignoring analysis of the regional capacity value of solar in the 7th Power Plan of the Northwest Power and Conservation Council (NPCC). *Id*. at 26-27. VS-MEIC argues that the Commission's decision on the capacity contribution of solar resources rests on an analysis of solely the load of NorthWestern, which is inconsistent with statements by the Commission in other dockets on the relevance of regional peak load. *Id*. at 28.

44.     VS-MEIC argues that the Commission's decision ignores high-demand hours close to the annual peak, citing evidence indicating that in the past four years about 70% of the top 10% of load hours have occurred in the summer. VS-MEIC Recon. Mot. at 29; Ex. VS-1, Beach Dir. Test. at 25. It also argues that the Commission's capacity contribution analysis fails to account for aggregate capacity provided jointly by wind and solar resources, which exceeds the individual contributions of the two resource types. *Id*. at 29-30; Ex. VS-1, Beach Dir. Test. at 10; Hr'g Tr. at 182:13-20. It argues that ignoring aggregate capacity value is unreasonable and violates PURPA.

45.     The Commission's decision to incorporate an installed capacity contribution factor of 6.1% in the calculation of avoided costs for solar QFs is reasonable and supported by substantial evidence. The 6.1% capacity contribution factor reflects application of an exceedance method used by SPP. Evidence regarding the SPP method includes a copy of the SPP Planning Criteria and an Excel application with written instructions for calculating the credit for renewable resources. DR VS-032, response of John Bushnell, NorthWestern Energy, Jan. 11, 2017.

46.     The solar capacity contribution of 6.1% approved by the Commission is based on NorthWestern's application of the SPP method in this case. The calculation examines all months in a year, isolates the peak-load month for each year in a 10-year study period, and further isolates and aggregates the highest 3% of hourly loads for each of those peak-load months in a separate data set. This results in about 220 aggregated load hours with associated solar output, to which a 60% exceedance calculation is applied. NorthWestern's use of SPP's annual method is consistent with NorthWestern's annual load profile, which exhibits peaks in both summer and

winter. Use of a seasonal alternative in the SPP method would exclude one or the other season, resulting in a distorted capacity contribution measure for NorthWestern.

47.    The calculation of capacity contribution that VS-MEIC provides in support of its motion for reconsideration is not consistent with record evidence describing the SPP method. The SPP method gathers all 220 observations on solar output from the 22 highest load hours in each of the 10 annual peak-load months, stacks the observations by rank from high to low, and finds the observation at the 60th percentile, which is approximately the 132nd observation in the stack. This observation has a value such that 60% of the observations have higher solar output values. VS-MEIC's proposed method does not aggregate the 220 observations into a single stack before calculating exceedance, rather it measures 60% exceedance in each of the 10 sets of 22 solar output observations from the annual peak-load months, and finds the average of the 10 values.

48.    If the distributions of solar output values were similar in all of the annual peak-load months this difference in method would have small effect on the final result. But the distributions are not similar in all of the peak-load months. In particular, winter peak-load months have high frequencies of solar output observations with a value of zero, associated with peak loads on winter evenings; meanwhile, summer peak-load months have high frequencies of observations with values at or near maximum output, corresponding with peak loads on summer afternoons. VS-MEIC's method in this case, with marked differences in the solar output distributions of summer and winter months provides a different result than the SPP method. The Commission continues to rely on the SPP method, finding that aggregating all solar output values into a single ordered stack before calculating exceedance better represents the challenge of meeting load obligations at all times in all years, rather than adopting the VS-MEIC approach of finding the simple average of exceedance values calculated separately for each year.

49.    Although the evidence does not indicate that the SPP method encompasses an approach that would isolate the peak-load hours in the specific months that comprise the peak period in NorthWestern's QF-1 tariff, i.e., January, February, July, August, and December, the Commission analyzed those load hours in order to evaluate VS-MEIC's assertion that the SPP method produces a 36% capacity contribution when applied to those hours. However, applying the 60% exceedance measure to a 10-year aggregated data set comprising the top 3% of load hours in each of the five months results in a capacity contribution of 0%. VS-MEIC's failure to

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                    16

aggregate the annual data before measuring the exceedance level has a significant impact on the final result and is not consistent with evidence on how the SPP method works.

50.     Contrary to the arguments of VS-MEIC and FLS-CCR, the Commission's decision does not ignore evidence of the capacity values used by other utilities. Rather, the Commission found that NorthWestern has a strong winter peak, which makes its capacity needs distinguishable from the needs of purely summer peaking utilities. In the 10-year study period advocated by VS-MEIC, six of NorthWestern's annual peak months are winter months. The prevalence of winter peak-load hours in the data set limits the ability of solar resources to contribute capacity because solar facilities do not generate much energy during those load hours.

51.     VS-MEIC's argument that the Commission's decision ignores the contribution of solar during the majority of QF-1 tariff on-peak hours is undermined by the fact that the majority of the load hours in that period are not close to peak loads. The Commission analyzed all load hours in the QF-1 tariff's defined peak period, a data set of 18,352 observations over the 10-year study period. The resulting 60% exceedance measure of capacity is 9.1%. However, about 60% of the hourly loads in the aggregated data set are less than 900 MW, which is about 70% of NorthWestern's system peak. Thus, a capacity contribution based on this approach would rest mostly on loads that are not close to peak loads.

52.     The Commission finds that it would be unreasonable to set QF rates in this case based on the analysis by the NPCC in its 7th Power Plan. First, as only chapter 11 of that plan is evidence in this case. Second, although Table 11.8 in that chapter shows estimates of Associated System Capacity Contributions (ASCC) that exceed 50% of nameplate for solar resources, evidence demonstrating the reasonableness of compensating QFs based on ASCC values is lacking. The ASCC values facilitate rational interaction between the GENESYS and RPM models used by the NPCC to develop regional power plans. NPCC, 7th Power Plan at 11-24, footnote 15. The ASCC values convey a sense of each resource's contribution to system peak, but are not equivalent to firm energy load carrying capability and effective load carrying capability that are sometimes used to estimate the contribution of intermittent resources to firm energy and dependable capacity requirements. *Id*.

53.     In addition, to the extent the ASCC values capture a joint capacity contribution attributable to the interaction of existing hydroelectric capacity and new solar capacity, attributing all of that joint capacity contribution to solar in setting QF rates could

overcompensate QFs and effectively require customers to pay more than the avoided cost of alternative capacity. For example, both gas turbine and geothermal resources have ASCC values that exceed one—each MW of capacity acquired contributes 1.28 MW of winter system capacity. But it is not clear that because of this ASCC value a utility would be justified in paying 1.28 times the actual cost of a gas turbine, or that the avoided capacity cost for a utility planning to acquire a gas turbine is 1.28 times the cost of gas turbine capacity if the utility contracts with a geothermal QF instead. To the extent ASCC values capture a regional system-wide capacity effect of solar resource acquisition, translating those values into QF payments that comply with PURPA is not adequately addressed in evidence in this case, but is a line of inquiry that should be pursued in future cases.

54.     The Commission also did not ignore regional load information, as VS-MEIC argues; rather, such information does not exist in the record. The evidence VS-MEIC points to shows only that NorthWestern's balancing area is projected to experience peaks in summer. The record does not include hourly balancing area load data which, when combined with corresponding hourly solar production, would allow for application of the SPP method. The Commission, however, agrees with VS-MEIC that studying NorthWestern in a regional context is important to understand capacity contribution. "NorthWestern's resource adequacy should be measured by its retail load's position relative to the region's or interconnection's peak demand, while taking into consideration import limitations." *In re NorthWestern Energy's 2015 Electricity Supply Procurement Plan*, Docket N2015.11.91, Mont. Pub. Serv. Comm'n Comments ¶ 24 (Feb. 2, 2017). With a more robust set of hourly regional or interconnection load data and a similar dataset concerning import constraints, together with the dataset available in this proceeding of NorthWestern loads, it would be possible that the Commission's above findings would change.

55.     Similarly, the record lacks adequate evidence of the aggregate capacity value attributed to synergies of wind and solar resources on NorthWestern's system. In particular, no quantitative evidence exists regarding such capacity synergies and how to properly attribute such capacity synergies to the capacity contribution factors of individual wind and solar facilities for purposes of ratemaking.

56.     The precise mathematic relation between load (whether that of NorthWestern or the region) and loss-of-load probability is not in evidence in this proceeding. However, it is

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                    18

generally known that loss-of-load probability is a nearly exponential function of system load.[2] In this case, while it is not possible to know with certainty that an exceedance analysis of the top 3% of loads yields superior results to an analysis of, say, the top 1% or 10%, the use of the top 3% of loads, and the resulting 6.1% capacity contribution factor, certainly fall within a range of reasonableness, given that the very highest loads are more likely to result, all else being equal, in an event of capacity insufficiency.

57.     Based on the additional findings above, on reconsideration the Commission affirms its decision in Order 7500c to calculate avoided costs for solar QFs using a capacity contribution factor of 6.1% of installed capacity.

Proxy Method

58.     VS-MEIC argues that the Commission's calculation of total avoided costs is unlawful and unreasonable, in part because the Commission misapplied the proxy method, and because the "Commission unreasonably based total avoided costs on a capacity resource addition in 2025, when the evidence demonstrates capacity needs in 2019." VS-MEIC Reconsid. Motion at 14. Due to these alleged errors, VS-MEIC argues that the Commission's order fails to adequately compensate QFs for their capacity contribution.

59.     VS-MEIC argues that even if the Commission's decision to use a CCCT as a proxy resource is reasonable, the Commission's calculation fails to reflect the timing of NorthWestern's next-planned resource addition, which is 2019 and consists of three RICE generators. VS-MEIC Reconsid. Motion at 15-16. VS-MEIC argues that it is unreasonable and unlawful for the Commission to assume NorthWestern can defer capacity additions to 2025, which, under NorthWestern's 2015 Plan, is when a CCCT is acquired. In addition, VS-MEIC states that the Commission's decision diverges from the past practice of paying QFs for capacity, based on the cost of the proxy unit, starting in the year the capacity is needed. *Id.* It argues that, in light of NorthWestern's immediate need for capacity, "it was unreasonable for the Commission to defer payments to QFs for their capacity contributions before 2025." *Id.*

---

[2] *See* Harry G. Stoll, Least Cost Electric Utility Planning 343 (1989); Edward Kahn, Electric Utility Planning & Regulation 82 (1988); *see also* Mont. Code Ann. § 2-4-612(7) ("The agency's experience, technical competence, and specialized knowledge may be utilized in the evaluation of evidence.").

60.    VS-MEIC misapprehends the Commission's avoided cost calculation. Contrary to VS-MEIC's assertion, the Commission's avoided cost calculation results in rates that compensate QFs for their capacity contributions consistent with the timing of the RICE units identified in NorthWestern's 2015 Plan.

61.    The Commission's avoided cost calculation adopts NorthWestern's proposal to base avoided capacity costs on an aeroderivative combustion turbine and results in an annualized avoided capacity cost of $116.73/KW-year for a QF that provides equivalent capacity value. Order 7500c, ¶ 56. This avoided capacity cost reflects the 25-yr levelized capital and fixed operation and maintenance costs of a plant acquired in 2018. *See* QF-1 Avoided Cost Rate Filing Compliance Filing, Attachment at 4 (Aug. 4. 2017). The avoided capacity cost for solar QFs is $7.12/KW-year based on the approved 6.1% capacity contribution (6.1% × $116.73 = $7.12). When this avoided capacity cost is divided by expected solar energy production during on-peak hours, the $7.12/KW-year rate is equivalent to $0.00919/kWh. Order 7500c, ¶ 69. This amount is added to avoided energy costs during on-peak hours to compensate a solar QF for its capacity contribution. *See* NorthWestern Energy Electric Tariff Schedule QF-1, Sheet 74.2, Option 1(a). The difference between the off-peak and on-peak rates available to solar QFs is approximately $0.009/kWh. Because the avoided capacity cost calculated for solar QFs reflects the acquisition of an aeroderivative combustion turbine in 2018, the Commission's decision in Order 7500c reasonably reflects the timing of NorthWestern's next-planned resource addition and does not assume NorthWestern defers capacity additions to 2025. In addition, the approved rates compensate QFs for capacity immediately; the Commission did not "defer payments to QFs for their capacity contributions before 2025," as alleged by VS-MEIC. Therefore, on reconsideration, the Commission affirms the reasonableness of the avoided costs calculated in Order 7500c.

General Tariff Changes

62.    NorthWestern requests that the Commission reconsider its decisions in Order 7500c in terms of the absence of findings on certain changes to the QF-1 tariff that NorthWestern requested. Order 7500c does not approve, deny, or discuss these proposed tariff changes. One of the tariff changes requested by NorthWestern would eliminate rate Option 2(a), which is an hourly rate based on the cost of marginal market purchases and a rate that has never been used by

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                          20

QFs. In addition, NorthWestern requested the addition of a definition of "contract length" and the removal of obsolete language regarding a non-existent Option 3. NorthWestern also proposed to replace rate Options 1(a), (b), and (c) with a table of rates for the range of available contract lengths and for various QF resource types.

63.    The absence of findings on these proposed tariff changes in Order 7500c was an inadvertent oversight. NorthWestern's proposed changes were not contested by intervening parties in this case. The Commission has reviewed the proposed changes, finds them reasonable, and approves them.

Legally Enforceable Obligation

64.    On July 19, 2017, Pacific Northwest Solar ("PNWS") and NorthWestern (collectively, "Joint Movants") filed a Joint Petition for Limited Rehearing, or in the Alternative, Limited Reconsideration of Order No. 7500. The Joint Movants requested the rehearing "to reopen the record in this proceeding for the limited purpose of receiving additional evidence relevant to [PNWS's] Motion for Relief from Order No. 7500 regarding the Benton, Bootlegger, Choteau, and Manta solar projects." Mot. for Rehearing 2 (Jul. 19, 2017). This Motion was "denied by operation of law based on the issuance of" Final Order 7500c. Final Order 7500c ¶ 15.

65.    On July 31, 2017, NorthWestern and PNWS filed a Joint Motion for Reconsideration of Final Order 7500(c), specifically asking the Commission to reconsider its decision to deny PNWS's Motion for Relief from Order No. 7500. In Order 7500, the Commission stated that the Joint Motion does not address the question of "whether some solar QFs eligible for QF-1 tariff rates have made sufficient commitments to deliver energy and capacity to warrant excluding them from the effect of the suspension, despite not having fully executed contracts with NorthWestern . . . ." Order 7500 ¶ 45. The Commission found its requirements for QFs "to tender an executed power purchase agreement to the utility . . . with specified beginning and end dates . . . and an executed interconnection agreement" to establish an LEO a reasonable standard. *Id.* ¶ 47 (quoting Order 6444e). The Joint Movants argue that "[t]he Commission did not define the term 'fully executed' but used that term in contrast to a 'negotiated contract.'" Joint Mot. for Reconsideration 3 (Jul. 31, 2017). Additionally, Joint Movants argue that even if NorthWestern had not signed the PPA, it had "relayed consent"

establishing an LEO and creating "a sufficient commitment to warrant excluding them from the effect of the suspension." *Id.*

66.     Pacific Northwest Solar filed a separate Motion for Reconsideration of Final Order 7500c on August 2, 2017. In that Motion, Pacific Northwest Solar urges the Commission to "reconsider the standard it uses to evaluate legally enforceable obligations." PNWS Mot. for Reconsideration 2 (Aug. 2, 2017). It argues "[w]hile Whitehall Wind is one measure of a LEO, it is not the only measure of a LEO and is not the appropriate test to be used in this case." *Id.* at 3. Pacific Northwest Solar urges that the touchstone of establishing an LEO is the QF's commitment to sell to an electric utility, not the actions of the utility. *Id.* at 4–6.

67.     On October 20, 2017, NorthWestern filed a *Motion for Clarification and Brief in Support*. NorthWestern argues that the "Commission has not clearly stated what it meant by fully executed contracts and whether the Four Projects which had executed PPAs but not interconnection agreements are included or excluded from the suspension." NorthWestern Mot. for Clarification 2 (Oct. 20, 2017).

68.     The Commission determines that it does not need to define fully executed contracts as it is clear that the four PNWS projects have failed to have executed interconnection agreements in place prior to the suspension pursuant to Order 7500. Pursuant to that Order, both "an executed power purchase agreement to the utility . . . with specified beginning and end dates . . . and an executed interconnection agreement" are required for exemption from the suspension. Order 7500 ¶ 47. Both NorthWestern and PNWS do not dispute that the four projects did not have interconnection agreements in place for any of the four projects. *See* NorthWestern Mot. for Clarification 3 and NorthWestern and PNWS's Joint Mot. for Reconsideration 3 (July 31, 2017). It does not matter for the purposes of the Commission's suspension whether the PPAs were considered fully executed or not, the projects did not meet the safe harbor provisions for QF standard rates for solar projects of 3 MWs or less as set out in Order 7500.

69.     Even if the Commission ignored the interconnection requirement of Order 7500 and conducted an investigation to define the parameters of a fully executed contract between NorthWestern and PNWS involving the four projects, the Commission still lacks authority over executed contracts under Montana law. The Joint Movants argue that even if NorthWestern had not signed the PPA, it had "relayed consent" establishing an LEO and creating "a sufficient commitment to warrant excluding them from the effect of the suspension." Joint Mot. for

Reconsideration 3 (Jul. 31, 2017). If relayed consent and a sufficient commitment result in a possible executed contract here, then the Commission does not have jurisdiction over contract disputes between QFs and electric utilities:

> The PSC also contends its jurisdiction over executed contracts is contemplated by the language in subsection (2) that authorizes it to determine the rates and conditions of the contract . . . during a rate proceeding involving the review of rates paid by a utility for electricity purchased from a [qualifying facility]. In the Court's view, however, that language simply authorizes the PSC to review the rates as part of a rate proceeding, and does not confer jurisdiction over executed agreements on the PSC.

*Colstrip Energy Limited Partnership v. Montana Power Company*, 1995 Mont. Dist. LEXIS 206, *6-7. The Court went on and concluded that the Commission does not have judicial powers and "that the PSC was not given, and does not have, jurisdiction to adjudicate disputes over executed agreements between utilities and qualifying facilities under Section 69-3-603, MCA." *Id* at 78. When the Commission previously denied Boulder Hydro's petition for declaratory ruling involving a contract price dispute, the Commission stated that:

> Nothing in PURPA [a]ffects the validity of any contract entered into between a [QF] and an electric utility for any purchase. [S]ection 292.301(b)(2) provides that the [Federal Energy Regulatory] Commission's avoided cost regulations (and a state's implementation of those regulations) do not affect the validity of any contract entered into between a QF and an electric utility.

*In re Boulder Hydro L.P.*, Docket D2015.7.60, Order 7447 ¶¶ 11–16 (Oct. 27, 2015) (internal citations omitted).

      70.     These authorities demonstrate that the Commission does not have jurisdiction over the formation of a contract between a QF and the utility until a QF has requested the Commission to enforce an LEO:

> [A] QF has the option to commit itself to sell all or part of its electric output to an electric utility. While this may be done through a contract, if the electric utility refuses to sign a contract, the QF may seek state regulatory authority assistance to enforce the PURPA-imposed obligation on the electric utility to purchase from the QF, and a non-contractual, but still legally enforceable, obligation will be created pursuant to the state's implementation of PURPA. Accordingly, a QF, by committing itself to sell to an electric utility, also commits the electric utility to buy from the QF; these commitments result either in contracts or in non-contractual, but binding, legally enforceable obligations.

*JD Wind 1, LLC*, 129 FERC P 61,148, at P 25 (2009) (internal footnotes omitted).

71.     When QFs have requested enforcement of an LEO, the Commission has relied on its bright line LEO test established in the *Whitehall Wind* decision. *See, e.g. In re Crazy Mountain Wind, LLC*, Docket D2016.7.56, Order 7505c ¶¶ 9–24 (Apr. 18, 2017). The Commission has done that here. The Commission's Order 7500 required a QF to complete both an executed power purchase agreement to the utility and an executed interconnection agreement to fall under the safe harbor provisions involving the stay of QF-1 solar projects between the 100kw threshold and 3 MW. These four projects fail to meet the Commission's LEO test prior to the implementation of the stay and, as a result, they do not qualify for the previous standard rates. Any dispute between NorthWestern and these projects should be viewed as a contract issue to be resolved in the appropriate court.

72.     Pacific Northwest Solar urges the Commission to "reconsider the standard it uses to evaluate legally enforceable obligations." PNWS Mot. for Reconsideration at 2. The Commission is not persuaded to change its LEO test at this time. *See* Order 6444e ¶¶ 46–49. States have the authority to determine the parameters of QF PPAs, "including the date at which a legally enforceable obligation is incurred under State law." *Power Res. Grp., Inc. v. PUC*, 422 F.3d 231, 238, 165 F. App'x 378 (5th Cir. 2005). That Court noted that if FERC "had determined it necessary to set more specific guidelines concerning LEOs, it could have done so . . . [t]he plain text of the FERC regulation, however, fails to mandate that requirement. Rather, defining the parameters for creating an LEO is left to the states and their regulatory agencies." *Id.* at 239.

73.     In *Exelon Wind 1, LLC v. Nelson*, the 5th Circuit stated that the plain language of FERC's regulation does not state all QFs "must *always* be allowed to enter into LEOs." 766 F.3d 380, 396 (5th Cir. 2014). Instead, "it is the [Texas] PUC, rather than FERC, that defines the parameters for when a [QF] may form an [LEO]." *Id.* The *Exelon Wind 1* court determined that *Power Resource III* "does not stand for unalloyed deference to the state regulatory authority in interpreting FERC's regulations," particularly because FERC took a position that defining the parameters of LEO formation were within the state's discretion. *Id.* at 411 (citing *Power Res. Group, Inc. v. PUC,* 422 F.3d 231, 238 (5th Cir. 2005); *see also W. Penn Power Co.*, 71 FERC ¶ 61,153, 61,495 (May 8, 1995) (grant the states discretion in setting specific parameters for LEOs). At best, it stands for deference to the state regulatory authority when FERC has taken no action and has previously announced that it will leave an ambiguous provision to the state

agencies to interpret. *Id.* The court concluded that, "just as in *Power Resource III,* the mere fact that the PUC rule prevents some QFs from entering into Legally Enforceable Obligations at *certain times* does not mean the PUC failed to implement FERC's regulation." *Exelon Wind 1, L.L.C.*, 766 F.3d at 396–97 (emphasis added).

74.     Hearing the concerns expressed in the *FLS Energy* decision, the Commission conducted an investigation to determine "whether irregularities occurred in FERC-approved interconnection process that would have precluded a QF from developing a project." Final Order 7500c ¶ 91; *see also FLS Energy, Inc.*, 157 FERC P 61,211 (2016). The Commission resolved, through investigation, that no evidence existed in the record that NorthWestern failed to follow FERC's approval process. Final Order 7500c ¶ 91. The steps set out in the *Whitehall Wind* test do not represent an insurmountable principle like the firm-power rule in *Exelon Wind 1,* but are a matter of timing, akin to the 90-day rule in *Power Resource Group III.* 422 F.3d 231.

75.     The Commission recognizes that the IA element of the *Whitehall Wind* test, as discussed in Final Order 7500c, may be worthy of further analysis as a prong of a bright-line test. Accordingly, the Commission invites any interested party to initiate rulemaking to address these concerns. *See, e.g., Petition of the Montana Consumer Counsel to Amend ARM 38.5.2527 through 38.5.2528,* Docket N2017.9.76 (filed Sept. 25, 2017). The Commission has rulemaking authority in matters affecting QFs. Mont. Code Ann. § 69-3-604(5). Any interested person "may petition an agency requesting the promulgation, amendment, or repeal of a rule." Mont. Code Ann. § 2-4-315.

Symmetry Finding

76.     NorthWestern requests that the Commission reconsider "its decision to apply symmetrical treatment to utility resources" that, under the language of Final Order 7500c, requires utilities to apply a 10-year limit "in their acquisition of or contract for additional resources." NWE Mot. for Reconsideration at 1–2. In requesting reconsideration, NorthWestern raises three arguments: 1) the Commission's symmetry finding attempts to create a rule without following MAPA; 2) the Commission's new rule conflicts with statutes and existing Commission rules; and 3) the Commission's rule arbitrarily applies symmetry to dissimilar resources. NorthWestern also requested clarification of its Demand Side Management ("DSM") programs

in relation to the symmetry requirement. *See* NorthWestern Energy's Amended Mot. for Reconsideration and Clarification (Aug. 25, 2017).

77.     NorthWestern argues that the Commission's decision regarding symmetry is unlawful because the "finding is a 'rule' that is applicable to all utilities." NWE Mot. for Reconsideration at 2. NorthWestern argues that rulemaking is defined by Mont. Code Ann. § 2-4-102 and that the Commission's symmetry finding meets this definition. *Id.* at 3. NorthWestern also cites to the recent Montana Supreme Court decision in *Southern Mont. Tel. Co. v. Mont. Pub. Serv. Comm'n*, which found that the Commission's rubric for evaluating confidentiality of compensation for managers of eligible telecommunications carriers was unlawful rulemaking. *Id.* at 3–4 (citing 2017 MT 123, 387 Mont. 415, 395 P.3d 473). NorthWestern argues that the Commission's symmetry finding is similar to the unlawful rulemaking in *Southern Mont. Tel. Co. Id.* at 4. NorthWestern also argues that the Commission "did not give notice that it was proposing a rule applicable to all utilities" and that this is in violation of NorthWestern's due process right "to be heard at a meaningful time and in a meaningful manner." *Id.* at 4–5 (citing *Smith v. Bd. of Horse Racing*, 1998 MT 91, ¶ 11, 288 Mont. 249, 252, 956 P.2d 752, 754).

78.     NorthWestern argues that the Commission's symmetry finding conflicts with statutes and Commission rules. NorthWestern notes that there are statutes that "place specific planning and procurement obligations on utilities and state the objectives utilities shall pursue in resource planning and procurement." *Id.* at 5 (citing Mont. Code Ann. § 69-8-419(3)). NorthWestern asserts that the Commission's symmetry finding conflicts with the Commission's rule defining "planning horizon." NWE's Mot. for Reconsideration at 5–6 (citing Mont. Admin. R. 38.5.8204 and 38.5.8202). NorthWestern points out its "2015 Electricity Supply Resource Procurement Plan identifies needs over a 20-year planning horizon" and that the limitations contained in the Commission's symmetry finding "directly conflicts with its own rules regarding a planning horizon." *Id.* 5–6.

79.     Finally, NorthWestern argues that the Commission's rule arbitrarily applies symmetry to dissimilar resources. NorthWestern points out that it must "perform a resource need assessment before acquiring any multi-year supply resource," and that it is subject to various reliability requirements. *Id.* at 6 (citing Mont. Admin. R. 38.5.8210). By comparison, NorthWestern argues that QFs are not subject to these planning requirements and that QFs

generally produce intermittent and non-dispatchable energy. *Id.* at 6–7. As a result, NorthWestern argues it is required "to acquire resources that do not increase its ability to meet customer needs." *Id.* at 7. NorthWestern argues that the Commission did not take these differences into account when requiring symmetrical treatment between QFs and utility owned and acquired resources. *Id.*

80.     Commission staff circulated a memorandum to the Commission in advance of the work session addressing the various motions for reconsideration of Final Order 7500c. *See* Staff Memo on Mot. for Reconsideration (Oct. 2, 2017). Commission staff questioned the applicability of PURPA's principle of nondiscrimination to contract length. *Id.* at 22–24. Instead, Commission staff asserted that the requirement for nondiscrimination only applied to prices. *Id.* at 22–23 (citing 18 CFR § 292.304(a)). In arriving at this conclusion, Commission staff also examined FERC Order No. 69 which identifies a QF's "expected return on a potential investment" as being separate from the "price at which the [QF] can sell its electrical output." *Id.* at 23 (quoting *Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978*, Order No. 69, 45 Fed. Reg. 12,214, 12,218 (Feb. 25, 1980) ("This return will be determined in part by the price at which the [QF] can sell its electrical output."). Commission staff interpreted this language to provide guidance that contract length should be long enough to allow the QF to attract capital investment. *Id.* Commission staff reasoned that if the Commission had implemented the correct avoided cost calculation, the nondiscrimination requirement contained in 18 CFR § 292.304(a) would be satisfied. *Id.* at 12,222 ("The Commission has therefore provided that the rate for purchases meets the statutory requirements [of 18 CFR § 292.304] if it equals avoided costs . . . ."). As a result of this limited application of this nondiscrimination requirement, staff argued the Commission did not need to apply this concept to contract length. *Id.* at 24.

81.     The Commission maintains the symmetry finding in this Order on Reconsideration. In Final Order 7500c, the Commission reasoned that symmetrical treatment of QFs and non-QFs was necessary to comply with the PURPA and FERC prohibition on rate discrimination. Final Order 7500c ¶¶ 111–114. Commission staff's analysis of Order No. 69 overlooks the fact that the price afforded to a QF is the levelized stream of the estimated avoided

costs over the total contract length afforded to the QF.[3] Mathematically, the levelization factor is a function of the discount rate and contract length. As the Commission described in ¶ 130 of Final Order 7500c and further articulates using examples of our practice with respect to NorthWestern's rates below, *infra* ¶¶ 82–85, the methodology and forecast period used to determine avoided cost in this proceeding cannot be applied without violating 18 CFR § 292.304(a)'s prohibition on discrimination, unless the Commission ensures its non-discriminatory application. This is why the Commission, consistent with its symmetrical application of QF ratemaking in other proceedings, further described below, *infra* ¶¶ 86–88, retains a symmetry finding here. In short, the question of the price or rates paid to QFs cannot be addressed without also addressing the contract length provided to the QF, because the forecast period that results from the latter is a primary input to price or rate paid to a QF.

82.      The Commission staff's bifurcated approach to nondiscrimination rests on the false premise that rates and contract length are unrelated, even though the Commission's objective of mitigating the risk of forecast error imposed on ratepayers is achieved through limiting contract length, and thus the forecast horizon, of QFs. In doing so, the Commission has followed FERC direction to balance the interests of ratepayers alongside QFs. *See* 18 CFR § 292.304(a). Yet, the Commission cannot effectively carry out this responsibility without taking into consideration the risks that long-term contracts, from any source, impose upon ratepayers. *See* Additional Issue Test. Stamatson at 3:10–4:14. The MCC argues that just and reasonable rates to the electric consumer contained in 18 C.F.R. § 292.304(a) must be balanced against the requirement to encourage long-term contracts in Mont. Code Ann. § 69-3-604(2). MCC Post Hearing Br. 10. Just as this balance of risk between customers and QFs must be appropriately balanced, so too must the acceptable measure of risk that the Commission allocates between the utility and the ratepayer to ensure that QFs are not discriminated against under PURPA.

83.      As mentioned above, QFs are offered a levelized price over the course of a contract. A similar process occurs when a utility arrives at a total revenue requirement for a generating asset in a preapproval docket that is recovered over a given period of time. The

---

[3] Meanwhile, the concept of return identified by Commission staff in Order No. 69 is not relevant to our determination on this point. It addresses only the ability of a QF, once an appropriate avoided cost is arrived at, "to be able to evaluate the financial feasibility" of the project. *Compare* Staff Memo on Mot. for Reconsideration at 23 *with* Order No. 69, 45 Fed. Reg. at 12,218. The concept which staff points to is not at issue in this docket, since the QF-1 standard rate is determined in advance, by this Order and Order 7500c, and does not change over the length of the contract

Commission did exactly this in providing preapproval of NorthWestern's ownership in Colstrip
Unit Four ("CU4"):

> The various estimates of future market prices in the record translate into
> dramatically different estimates of the economic benefits of rate-basing CU4. For
> example, using the economic evaluation method illustrated in Exhibit NWE-15d
> along with NWE's estimates of future CU4 revenue requirements (assuming
> 10 percent return on equity and 6.5 percent debt for 34 years) and medium $CO_2$
> costs, the results range from a net present value benefit of about $176 million with
> NWE's May 28, 2008 market price forecast to a net present value cost of about
> $49 million with NWE's September 10, 2008 market price forecast, a difference of
> $225 million. If, instead of late June 2008, NWE had filed its Application in late
> September 2008, its market price protocol would have required NWE's supply
> function to either oppose rate-basing CU4, or justify rate-basing through economic
> considerations not captured in its Exhibit NWE-15d evaluation method. The table
> below shows the net present value of the status quo compared to rate-basing CU4
> using the Exhibit NWE-15d method under various market price scenarios.

*In re NorthWestern Energy's Application for Preapproval of Colstrip Unit 4*, Docket
D2008.6.69, Order 6925f, Finding of Fact ¶ 222 (Nov. 13, 2008). In that docket, the Commission
accepted NorthWestern's argument that 34 years was the appropriate remaining life of the asset,
and that the overall cost of service and revenue requirement would be reduced into a rate payable
to NorthWestern based on this duration. *Id.* ¶¶ 44, 257. MCC disagreed with this approach and
argued that 24 years was the correct time period to grant cost-of-service treatment and forecast
period for net present value ("NPV") of the generating asset: "Wilson added that other
assumptions in NWE's NPV comparisons are invalid, such as the assumption that CU4 has a
remaining life of 34 years while a new plant is assumed to have a life of 30 years and the
assumption that NWE's only purchase option is the Mid-C spot market when NWE has
historically made medium- and long-term purchases at lower prices." *Id.* ¶ 105.

     84.     The capital invested in a utility-owned power plant is usually justified by a
comparison of the total cost of an asset with the expected market value of its production. *See*
Mont. Code Ann. § 69-8-421(6) (the Commission must find, among other things, that the
planned electricity supply resource is in the public interest and consistent with electricity supply
resource planning and procurement requirements). Included in the Commission's electricity
supply resource planning and procurement standards is the requirement to "provide adequate and
reliable electricity supply service at the lowest long-term total cost . . . ." *Id.* § 69-8-419(2)(a).
Similar to the CU4 preapproval proceeding described above, the Commission has used energy

market forecasts for examining the value of other NorthWestern owned assets. *In re NorthWestern Energy's Application for Preapproval of Dave Gates Generating Station,* Docket D2008.8.95, Order 6943e, Findings of Fact ¶¶ 211–233 (Mar. 21, 2012) ("At this time, market products likely offer the greatest possibility of avoiding or deferring [Dave Gates Generating Station's (formerly Mill Creek Generating Station)] full capacity."); *In re NorthWestern Energy's Application for Preapproval of Spion Kop Wind Project*, Docket D2011.5.41, Order 7159l ¶¶ 113–132 (Feb. 16, 2012) ("[E]ven at a long-term average annual capacity factor of 36% Spion Kop mitigates fuel price risks, market risks, and environmental risks, as illustrated by the comparative cost of NWPCC and EIA natural gas price forecast-based market alternatives and avoided cost estimates.").

85.    In the recent docket concerning NorthWestern's application for preapproval of the hydroelectric facilities, NorthWestern evaluated the purchase price using a variety of methods, including discounted cash flow ("DCF") models, and both deterministic and stochastic comparisons of alternative portfolios. *In re NorthWestern Energy's Application for Preapproval of Hydroelectric Generating Facilities*, Docket D2013.12.85, Final Order 7323k ¶¶ 26–41, 51–59 (Sept. 25, 2014). The DCF models evaluated the facilities from the perspective of a merchant generator, and accordingly modeled the value of electricity generation at the facilities using market prices to estimate the gross value of output. *Id.* ¶ 30. The deterministic and stochastic models compared the expected cost of production from the hydroelectric resources to the cost of electric energy procured either at market or generated from a natural gas fired combined-cycle combustion turbine ("CCCT"). *Id.* ¶ 54. In response to Commission discovery, NorthWestern expanded the stochastic analysis to include alternatives of wind combined with a CCCT or with a simple-cycle combustion turbine. *Id.* ¶ 58.

86.    The Commission found NorthWestern's modeling efforts to be reasonable, and found the $870 million rate-based cost of the hydroelectric facilities to compare favorably with alternative energy supply resources. *Id.* at ¶¶ 79–80. In the findings of fact in Final Order 7323k, the Commission demonstrates that it determines the value of Company-proposed resources using the expected values of forecast market prices and proxy resources in similar fashion to the methods used to estimate avoided costs in this proceeding. Likewise, the Commission's approval of the $870 million rate-based cost of the hydroelectric facilities exposes NorthWestern's customers to the price risk inherent in basing a current acquisition on the forecast of future

electricity and natural gas market prices, as well as the forecast of future proxy resource capital, labor, and tax expenditures. In short, each time NorthWestern has asked the Commission to approve its acquisition of a power plant, it has established the rates consumers will pay in a manner similar to, or even identical to, the way in which the Commission forecasts the avoided-cost rates paid to QFs.

87.     NorthWestern argues in its Motion for Reconsideration that it was not given adequate notice regarding the symmetry finding. NWE's Mot. for Reconsideration at 4–5. In previous dockets, the Commission has extensively implemented PURPA's requirement for non-discrimination and has either rejected adjustments proposed for QFs that were not also made for utility-owned resources, or only made such adjustments based on their symmetrical application to the utility itself. NorthWestern's Motion for Reconsideration encounters none of this case law, recited in Final Order 7500c ¶ 112. The most recent adjustment to be the subject of litigation, called the Long-1 adjustment, is a particularly appropriate example because, like the abbreviation of contract length in this proceeding, the adjustment is an attempt to mitigate the risk to consumers arising from an inaccurate forecast of market prices over a long term. When it first grappled with this proposed adjustment, the Commission acknowledged as "a legitimate concern" the contention by NorthWestern and the MCC that "there is a risk that actual market prices will diverge from the projections, rendering the acquisition decision more or less economic in hindsight." *In re Greycliff, LLC*, Docket D2015.8.64, Order 7436e ¶ 18 (Nov. 4, 2016). The Commission notably associated that risk with "any long-term fixed-cost resource acquisition." *Id.* And although the Commission acknowledged this risk, it declined to subject the instant QF to the treatment because doing so would be discriminatory. *Id.* ¶ 16 ("[T]he methods used to attribute value to energy and capacity that would be produced by a resource the utility plans to own must be consistent with the methods used to attribute value to energy and capacity that would be produced by a QF, if avoided cost-based rates are to be nondiscriminatory."). Considering the same risk it had identified in *Greycliff*, the Commission in a succeeding QF proceeding did make an adjustment intended to mitigate the risk, but only after a lengthy examination in which the Commission was satisfied that NorthWestern itself was using the adjustment in valuing its own incremental resources. *In re Crazy Mountain, LLC*, Docket D2016.7.56, Order 7505c ¶¶ 25–35 (Apr. 18, 2017).

88.     To underscore the importance of nondiscrimination and symmetry, the
Commission did not simply leave itself satisfied that there was a single example of the utility
applying the treatment it proposed for the QF to its own resources. Instead, the Commission
"reinforces that this is a requirement: NorthWestern must use this methodology to value any
incremental owned or contracted electric supply resources." *Id* ¶ 28. This Commission decision
is not currently subject to challenge through a petition for judicial review. *Crazy Mountain Wind,
LLC, v. Mont. Pub. Serv. Comm'n*, CDV-2017-382, Order Dismissing Petition for Judicial
Review (Mont. 1st Jud. Dist. Ct. Aug. 22, 2017). The same risk that entailed a consideration of
the Long-1 adjustment is what gives rise to our decision on contract length in this matter.
Order 7500c ¶ 107. To imagine that the Commission would therefore not consider the
discriminatory or symmetrical aspect of a proposed tool to mitigate this risk ignores the
Commission's extensive consideration of this very matter. Here, the Commission has taken the
same approach as it did with the Long-1 adjustment in finding that to fulfill the
nondiscrimination mandate of PURPA, this 15-year limitation on forecasting periods used to
derive a rate NorthWestern customers are obliged to pay applies to both QFs and other
generating resources supplying those same customers.

89.     Similar to past decisions regarding symmetrical treatment between NorthWestern
and QFs, the Commission announced this adjustment on a prospective basis. *Id.* ¶ 112. The
Commission noted in Final Order 7500c this requirement "not apply to assets already owned or
under contract, whether QFs or non-QFs." *Id.* n.5. Accordingly, this is not a justiciable
controversy before the Commission. *See, e.g. Chicago v. Ill. Commerce Comm'n*, 233 Ill. App.
3d 992, 998, 1003, 174 Ill. Dec. 907, 910–11, 913, 599 N.E.2d 991, 997, 994–95 (1992) (finding
that the Illinois Commerce Commission's approval of Commonwealth Edison Company's
energy plan was not a justiciable controversy); *Mont. Power Co. v. Mont. Pub. Serv. Comm'n*,
2001 MT 102, ¶ 30, 305 Mont. 260, 267, 26 P.3d 91, 95 (finding that a constitutional takings
issue related to implementation of transition tracker was "not ripe for adjudication because
[Montana Power Co.] has yet to be deprived of any property, and any future loss at this point is
speculative."). The Commission's symmetry finding of limiting market forecast risk to 15-year
periods for both QF and NorthWestern assets will be incorporated into the Commission's further
comments in NorthWestern's 2015 procurement plan. *See generally In re NorthWestern
Energy's 2015 Electric Supply Procurement Plan*, Docket N2015.11.91 (filed Mar. 31, 2016).

This will also address NorthWestern's concerns regarding the treatment of its DSM programs. *See* NorthWestern Energy's Amended Mot. for Reconsideration and Clarification (Aug. 25, 2017).

90.     NorthWestern argues that the Commission's symmetry finding engages in rulemaking "applicable to all utilities" without conducting the proper process under MAPA. NWE's Mot. for Reconsideration at 3–5. MAPA defines a rule as an "agency regulation, standard, or statement of *general applicability* that implements, interprets, or prescribes law or policy or describes the organization, procedures, or practice requirements of an agency." Mont. Code Ann. § 69-2-102 (emphasis added). NorthWestern is mistaken. This contested case proceeding involves only NorthWestern's valuation of resources, and the Commission's symmetry finding applies only to NorthWestern. The finding therefore does not have general applicability because it does not apply to other utilities like Montana Dakota Utilities Co. ("MDU"). MDU uses a statutorily distinct planning and resource valuation process from NorthWestern. *Compare* Mont. Code Ann. §§ 69-3-1201 to -1206 (detailing the integrated least-cost resource planning requirements imposed on MDU) *with id.* §§ 69-8-419 (detailing the electricity supply resource planning and procurement imposed on NorthWestern). MDU is also located in the Midcontinent Independent System Operator, which makes it exempt from certain obligations that NorthWestern is subject to under PURPA. *See New PURPA Section 210(m) Regulations Applicable to Small Power Production and Cogeneration Facilities*, Order No. 688, 71 Fed. Reg. 64,342, 64,343–64,344 (Nov. 1, 2006). For other electric utilities in Montana, there is no automatic application of the Commission's symmetry finding in this docket because the process of enforcing PURPA and evaluating future utility acquisitions for other electric utilities is entirely different from that of NorthWestern. *Southern Mont. Tel. Co.*, ¶ 17 (finding the Commission was not evaluating protective orders on a case-by-case basis under the rubric because "[i]f the company's circumstances fit the formula, there is no further inquiry . . . .").

91.     NorthWestern argues that the Commission's symmetry finding conflicts with statutes and Commission rules. NWE's Mot. for Reconsideration at 5–6. As described above, examining the value of a utility-owned asset compared to market prices over a specific period of time is not a novel concept. Resource procurement under this statute has always included the requirement to "provide adequate and reliable electricity supply service at the lowest long-term total cost . . . ." Mont. Code Ann. § 69-8-419(2)(a). This is coupled with, among other things, the

requirement to find that acquisition is in the "public interest." *Id.* § 69-8-421(6). The
Commission has simply provided further refinement of these concepts to meet the requirements
of PURPA and mini-PURPA. 18 CFR § 292.304(a).

  92. NorthWestern also argues that the Commission's symmetry finding is in conflict
the Commission's rule defining "planning horizon." NWE's Mot. for Reconsideration at 5–6
(citing Mont. Admin. R. 38.5.8204 and 38.5.8202). At the time of filing its 2015 Procurement
Plan, NorthWestern had 21 PPAs with remaining durations ranging from three to 24 years. *See
In re NorthWestern 2015 Procurement Plan*, Docket N2015.11.91, Volume 1 8-14 to 8-18,
Volume 2 p. 35 (Mar. 31, 2017). Additionally, NorthWestern has estimated the life of various
modeled resources from seven to 40 years. Test. of John Bushnell, Ex.__(JBB-2) p. 6 of 10
(May 3, 2016). This information demonstrates that "long-term" as it is used in Mont. Admin. R.
38.5.8202(8) does not adequately inform "long-term" as it is used in Mont. Code Ann.
§ 69-3-604(2), or in the context of the Commission's other ratemaking functions as they appear
in statute. Allowing a reading where "long-term" in the meaning of the planning rule is binding
on ratemaking decisions would lead to a self-fulfilling prophecy where a decision made by a
member of NorthWestern's staff to undertake a computer modeling run of a certain duration
would have binding consequences on the Commission's ratemaking function. Additionally,
because the Commission is no longer limiting QFs or NorthWestern to a 10-year term, the
10-year definition of long-term contained in Mont. Admin. R. 38.5.8204 and 38.5.8202 should
no longer be relevant.

  93. NorthWestern also argues that the Commission's rule arbitrarily applies
symmetry to dissimilar resources. NWE's Mot. for Reconsideration at 6–8. The Commission's
analysis in the Colstrip Unit 4 preapproval docket, the hydro facilities preapproval docket, the
Greycliff QF docket, the Crazy Mountain QF docket, and this docket shows that forecasting error
is a risk common to both QF and utility-owned assets. Since the purpose of limiting the term's
length of QF contracts is to mitigate ratepayer exposure to risk, the same rationale should apply
to utility-owned assets regardless of the expected lifespan of a resource. For instance,
NorthWestern's own testimony sets wind and solar resources at an expected life of 30 years.
Test. Bushnell p. 6. Yet, the Commission has not granted QFs contract lengths of 30 years and in
this instance has granted a contract length of 15 years. *See also In re Crazy Mountain Wind,
LLC*, Docket D2016.7.56, Order 7505b ¶ 47 (Dec. 22, 2016) (approving a 25-year contract).

If NorthWestern can show that this results in inaccurate estimations of valuing a proposed resource, the Commission will consider including a terminal value in calculating the value of a proposed resource. *See, e.g. In re NorthWestern Energy's Application for Preapproval of Hydroelectric Generating Facilities*, Docket D2013.12.85, Order 7323k ¶¶ 36–38, 44, 51, 57, 63, 75, 153 (Sept. 25, 2014) (discussing the impact of terminal value on various methods of valuing the hydro assets). In future dockets associated with NorthWestern applications for electricity supply resources, the Commission would apply the principle of symmetry to determine the total value of an asset over its lifespan and, to the degree that there is said to be value associated with the resource because of years beyond 15 years which NorthWestern purports to make the resource a least-cost option, the Commission would consider a risk-sharing arrangement that would cause a party other than MCC's consumers—namely the owner of a generator—to bear some responsibility for the validity of those assumptions about the outer years. One alternative to this approach would be to allow a utility to recover a resource's full capital cost within 15 years, but in such a case a resource would only be cost-justified to the market if the market forecast suggested substantially higher prices than it does today. However, in a situation such as the instant proceeding, in which the Commission is attempting to protect consumers from the likelihood that outer year forecasts are inflated, either of these approaches is symmetrical, because either a QF or NorthWestern would be in a position to either take a risk-based on potential outer-year rewards or to work to recover their capital investment entirely within a shorter period. Both approaches shield consumers from the undue risk that is the core reason for the Commission's abbreviation of the forecast period. In other words, the positions of the utility and the QFs are not dissimilar in relation to this risk or in its remedy of limiting to 15 years customers' exposure to it. A symmetrical approach can be one that recognizes the disparate ways in which projects are financed, their costs recovered from consumers, and their lifespans projected, even while it acknowledges the similarities in the process to value projects' output and offers even-handed remedies. *Contra* Staff Memo on Mot. for Reconsideration pp. 24–25 (Oct. 2, 2017).

94.     NorthWestern also suggests that, because it is subject to "mandatory reliability requirements" associated with maintaining the grid in "balance, on a moment-to-moment basis," that it is inappropriate to put NorthWestern on the same footing as a QF. NWE Mot. for Reconsideration at 6–7. To the degree that certain resources provide services other than energy

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                              35

and capacity, this Order does not apply to those services. NorthWestern's argument on this point
it is inapplicable. As demonstrated above, these long-lived resources derive their value either
from or in relation to market price forecasts, and the risk of error in this forecasting applies
symmetrically to both NorthWestern resources and a QF. Other than Dave Gates Generating
Station, which does provide substantial quantities of regulation service, NorthWestern's
resources primarily supply and were valued for their energy and capacity contributions, which
are the same products which QFs are entitled by law to be compensated for, on a non-
discriminatory basis. The Commission therefore does not understand the relevance of reliability
obligations to the risk under examination in this proceeding, and NorthWestern does not attempt
an explanation either. NorthWestern, in its motion, seems to conflate ancillary services such as
regulation or frequency response with capacity. Both NorthWestern's own 2015 Electricity
Supply Resource Procurement Plan and the Commission anticipate the bulk of resources, even
those that are dispatchable or have baseload characteristics, will provide mostly energy and
capacity. The Hydros, for example, were acquired without any attempt to value the ancillary
services they might be able to provide, and the latest NorthWestern resource plan suggests only a
small portion of their capacity can be dedicated or is useful for these services. *In re
NorthWestern 2015 Procurement Plan*, Docket N2015.11.91, Volume 1 p. 11-13 (Mar. 31,
2017). To the degree new resources do provide some measure of ancillary services,
NorthWestern would indicate as much by making a filing to include a part of their costs into its
FERC transmission tariff, since NorthWestern in its reliability function provides such reliability
services to wholesale customers also, not just the retail customers who pay for QFs.
NorthWestern's latest resource plan contains no discussion of this, and the Commission will be
skeptical of attempts to simply redefine what are clearly intended as capacity or energy resources
as providing ancillary services for the intent of providing them preferential, discriminatory
treatment.

## CONCLUSIONS OF LAW

95.     All findings of fact that are properly conclusions of law are incorporated herein
and adopted as such.

96.     The Commission is invested with the "full power of supervision, regulation, and
control" of public utilities. Mont. Code Ann. § 69-3-102. NorthWestern is a public utility subject
to the Commission's jurisdiction. *Id.* § 69-3-101.

97.     PURPA requires electric utilities to offer to purchase electricity from QFs at rates that are "just and reasonable to the electric customers of the electric utility and in the public interest," and which do not discriminate against QFs. 16 U.S.C. § 824a–3(b). "Nothing in [PURPA] requires any electric utility to pay more than the avoided cost for purchases." 18 C.F.R. § 292.304(a).

98.     "[N]ot less often than every two years" NorthWestern must provide the Commission with specific "data from which avoided costs can be derived," including its "plan for the addition of capacity by amount and type, for purchases of firm energy and capacity, and for capacity retirements for each year during the succeeding 10 years." 18 C.F.R. § 292.302(b). NorthWestern is required to submit such data "for use by the Commission in determining avoided costs and standard rates" within thirty days of filing a resource procurement plan. Mont. Admin. R. 38.5.1905(1).

99.     "Avoided costs" are "the incremental costs as determined by the [C]ommission to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 16 U.S.C. § 824a-3(d); Mont. Admin. R. 38.5.1901(2)(a).

100.    "Standard rates" are "based on avoided costs to the utility, are computed annually by the utility and made available to the public, are reviewed by the [C]ommission, and are applicable to all contracts with [QFs] which do not choose to negotiate a different rate." Mont. Admin. R. 38.5.1901(2)(j).

101.    Standard rates must be made available to "[QFs] with a design capacity of 100 kilowatts or less." 18 C.F.R. § 292.304(c). QFs "having a nameplate capacity no larger than three megawatts are eligible for standard offer rates." Mont. Admin. R. 38.5.1902(5). NorthWestern's standard rate QF-1 Option 1 offers fixed and levelized rates "calculated at the time the obligation is incurred," and its standard rate QF-1 Option 2 offers indexed rates "calculated at the time of delivery." 18 C.F.R. § 292.304(d).

102.    The Montana Supreme Court has determined that a standard rate does not remain just and reasonable or reflective of avoided cost simply because the Commission has left it unchanged. "Thus, under both state and federal law, rates for purchases from qualifying facilities must be reasonable and based on current avoided least cost resource data." Whitehall Wind, LLC v. Mont. Pub. Serv. Com., 2010 MT 2 ¶ 21, 355 Mont. 15, 223 P.3d 907. The Court found that

"[t]he PSC observed correctly that a utility must re-compute the long and short-term standard avoided cost rates after it submits an updated least cost plan filing." *Id.* ¶ 26. "The PSC further noted in its order that the rate for sales may not exceed the utility's avoided costs." *Id.* A standard rate may become unjust and unreasonable if it does not reflect current avoided cost data. The Court ultimately found that "[t]he PSC based the avoided cost tariff on out-of-date data in violation of Admin. R. Mont. 38.5.1905." *Id.* ¶ 28. The Commission is required to set rates based on current avoided cost data and rates that exceed the utility's avoided cost are not just and reasonable or consistent with Montana law.

103.    The Commission's "experience, technical competence, and specialized knowledge may be utilized in the evaluation of evidence." Mont. Code Ann. § 2-4-612. The Commission has recognized that "[a]lthough [Mont. Admin. R.] 38.5.1902(5) directs utilities to re-compute avoided cost rates based on the results of their most recent resource plans, it does not obligate the Commission to automatically approve those rates." Order 7108e ¶ 56. Instead, standard rates are "calculated on the basis of avoided costs to the utility which is determined by the [C]ommission to be appropriate for the particular utility after consideration, to the extent practicable, of the avoided cost data submitted to the [C]ommission by the utility and other interested persons." Mont. Admin. R. 38.5.1905(4).

104.    PURPA delegates broad authority to state regulatory commissions, which "play the primary role in calculating avoided cost rates and in overseeing the contractual relationship between QFs and utilities . . . ." *Indep. Energy Producing Assoc., Inc. v. Cal. Pub. Utilities Commn.*, 36 F.3d 848, 856 (9th Cir. 1994) (citing 16 U.S.C. § 824a-3(f)).

105.    "[I]f a qualifying small power production facility and a utility are unable to mutually agree to a contract for the sale of electricity or a price for the electricity to be purchased by the utility," either the QF or the utility may petition the Commission to set terms and conditions, including rates for sales of energy and capacity. Mont. Code Ann. § 69-3-603 ("The commission shall determine the rates and conditions of the contract upon petition").

106.    "When an electric utility is required to interconnect under section 292.303 of the Commission's regulations, that is, when it purchases the QF's total output, the state has authority over the interconnection and the allocation of interconnection costs." F.E.R.C. Order No. 2006, ¶ 516.

107.   FERC's declaratory order is advisory only and is non-binding unless and until it is upheld by a federal district court. The Commission may decide to re-evaluate its LEO test in a future proceeding, based on FERC's guidance. However, the decision by FERC does not undermine the use of that test in this case as a fair and reasonable basis for determining which solar QFs should be allowed to contract at the standard QF-1 rate in place at the time the Commission suspended that rate. Only the federal court system can make such a determination as to the lawfulness of the LEO standard. *See Portland General Electric Company v. FERC*, 854 F.3d 692, 698 (D.C. Cir. 2017). The D.C. Circuit explained recently that "FERC could avoid a great deal of confusion and waste of judicial resources by not using words like 'shall' and 'must,' and by making clear in its orders—as opposed to later in this court—that its discussions of PURPA-related issues are advisory only."

108.   Mont. Admin. R. 38.5.1902(5) states that "[a]ll purchases and sales of electric power between a utility and a qualifying facility shall be accomplished according to the terms of a written contract between the parties or in accordance with the standard tariff provisions as approved by the commission."

109.   Mont. Admin. R. 38.5.1903(2)(b) states that each utility shall purchase energy and capacity made available by a QF at a standard rate or if the QF "agrees, at a rate which is a negotiated term of the contract between the utility and the facility and not to exceed avoided costs to the utility."

110.   Mont. Admin. R. 38.5.1905(2) states that utilities "shall purchase available power from any qualifying facility at either the standard rate determined by the commission . . . or at a rate which is a negotiated term of the contract between the utility and the qualifying facility."

111.   Rates for purchases shall not discriminate against QFs. 18 C.F.R. § 292.304(a)(1)(ii). A QF may elect to be paid a rate based on forward projections at the time the QF incurs an obligation to sell its output. 18 C.F.R. § 292.304(d)(2)(ii). Such a rate for purchase is the product of a forecast for a given length of time. Imposing symmetrical treatment on utility-owned assets and other contracts for energy and capacity is therefore a necessary condition of the Commission's decision to abbreviate the contract length available to QFs.

112.   FERC's rules state nothing in the rules "[l]imits the authority of any electric utility or any qualifying facility to agree to a rate for any purchase, or terms or conditions relating to any purchase, which differ from the rate or terms or conditions which would

otherwise be required" or "[a]ffects the validity of any contract entered into between a qualifying facility and an electric utility for any purchase." 18 C.F.R. 292.301.

113.    In a contested case under the Montana Administrative Procedure Act, the Commission is generally "bound by common law and statutory rules of evidence." Mont. Code Ann. § 2-4-612(2). Under the statutory rules of evidence, "a party has the burden of persuasion as to each fact the existence or nonexistence of which is essential to the claim for relief or defense the party is asserting." *Id*. at § 26-1-402; *Mont. Envtl. Info. Ctr. v. Mont. Dept. of Evntl. Quality*, 2005 MT 96, ¶ 14, 326 Mont. 502 ("the party asserting a claim for relief bears the burden of producing evidence in support of that claim."); *see also* Mont. Admin. R. 38.5.182 ("A utility filing for an increase in rates and charges shall be prepared to . . . sustain the burden of proof of establishing that its proposed charges are just and reasonable"); Mont. Admin. R.38.5.8213 (requiring modeling and analysis to meet the "burden of proof in prudence and cost recovery filings"); Mont. Admin. R. 38.5.8220 (discussing how a utility may "satisfy its burden of proof.").

## ORDER

114.    QFs seeking the QF-1 rate are permitted a maximum 15-year contract length with no adjustment during the time period of the contract.

115.    This 15-year forecast period applies to future NorthWestern owned and contracted resources.

116.    The Commission will incorporate this symmetry finding into the Commission's comments on NorthWestern's 2015 procurement planning docket. *See generally In re NorthWestern Energy's 2015 Electric Supply Procurement Plan*, Docket N2015.11.91 (filed Mar. 31, 2016).

117.    The Commission adopts the general tariff changes described in ¶¶ 62–63 of this Order.


DONE AND DATED this 5th day of October, 2017, by a vote of 4 to 1, Commissioner Koopman dissenting.

DOCKET NO. D2016.5.39, ORDER NO. 7500d                                    40

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION

_____
BRAD JOHNSON, Chairman

_____
TRAVIS KAVULLA, Vice Chairman

_____
BOB LAKE, Commissioner

_____
ROGER KOOPMAN, Commissioner (dissenting)

_____
TONY O'DONNELL, Commissioner

ATTEST:

Rhonda J. Simmons
Commission Secretary

(SEAL)

