# EXHIBIT 8

Service Date: June 4, 2010

DEPARTMENT OF PUBLIC SERVICE REGULATION
BEFORE THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA

| | |
|---|---|
| IN THE MATTER OF the Petition of Whitehall Wind, LLC, for QF Rate Determination | ) UTILITY DIVISION |
| | ) |
| | ) DOCKET NO. D2002.8.100 |
| | ) ORDER NO. 6444e |

## ORDER ON REMAND

### Background

1.      In August 2002, Whitehall Wind, LLC (WHW) petitioned the Public Service
Commission (Commission) to set rates and conditions for a contract between it and
NorthWestern Energy (NWE) for the sale and purchase of the electric energy generated by a
proposed 50 megawatt (MW) wind facility.  The Commission held a hearing and issued Final
Order No. 6444c holding that ARM 38.5.1902(5) applied and that WHW could receive the
tariffed rate of $0.010639 per kilowatt hour.

2.      WHW petitioned for judicial review of the Commission's Order.  On December
22, 2008, the District Court issued an Order for Remand reversing and vacating Order No. 6444c
and remanding the matter to the Commission to establish a reasonable rate considering the
existence or non existence of a legally enforceable obligation (LEO), and the impact of an LEO
upon a rate (Remand Order) and instructed that the reasonable rate must be based on
NorthWestern Energy's (NWE) avoided costs.

3.      On May 19, 2009, the Commission directed staff to establish a procedural
schedule for legal briefing on whether WHW had incurred an LEO and the impact of the
existence or non-existence of an LEO on the determination of a proper rate.  Before the staff
could prepare and issue a Procedural Order, WHW filed its Brief of Clarification.  WHW
requested that the Commission not bifurcate the consideration of the LEO issue from
consideration of a reasonable rate and that the Commission consider Will Rosquist's sworn

affidavit regarding 2002 avoided cost data.[1]  WHW argued that the LEO issue is not a threshold issue.

4.      The Commission issued Procedural Order No. 6444d establishing a briefing schedule.  WHW filed its Opening Brief on October 20, 2009, NWE filed its Response Brief on November 16, 2009, and WHW filed its Reply Brief on December 4, 2009.  WHW filed a Citation to Supplemental Authority on January 26, 2010, and a Notice of Supplemental Authority on February 22, 2010.

### Parties' Arguments

#### WHW Opening Brief

5.      WHW asserted, "In 2002, [WHW] tendered a long-term power purchase contract to [NWE], NWE openly refused to negotiate with WHW, . . . and WHW was therefore forced to petition the [Commission] to get a rate for the contract.  Thus, at the time of the contested case proceeding, WHW had a legally enforceable obligation to sell its output to NWE, and therefore, a right to a rate based on current (2002) avoided costs."  Opening Br. at 1.  WHW claimed that the Commission "should offer WHW a choice between a long-term rate extrapolated to present values from 2002 avoided cost data (i.e., the date of the original LEO), or a long-term rate based on current avoided cost data (i.e., the date of the present or tolled LEO)."  Opening Br. at 2.

6.      WHW described its argument in the district court proceeding with respect to the LEO issue as follows: "WHW argued it had incurred an LEO in 2002 based on (among other factors) its offer of a detailed long-term contract to NWE in October 2002, its good faith attempt to negotiate that contract with NWE, and its ultimate petition to the Commission and the Commission's resultant decision (Order 6444c).  WHW presented case law from other jurisdictions supporting the interpretation that an LEO is incurred when the QF has done everything in its power to obtain a contract.".  Opening Br. at 6-7.

7.      WHW discussed the Remand Order and the law of the case doctrine.  WHW stated "the law of the case established in the [Remand Order] binds the Commission to consider data submitted by WHW and the Commission staff regarding 2002 avoided costs."  Opening Br. at 8.  WHW also asserted that the Commission should make additional evidence regarding the

---

[1] WHW also requested relief related to docket D2007.11.131.  That request is not at issue now.

avoided cost data for 2009 part of the administrative record "for a proper setting of the rate based on now-current avoided costs." *Id.*

8. WHW asserts, "In 2002, WHW incurred a legally enforceable obligation to sell its output to NWE, an obligation not diminished or extinguished by the passage of years." Opening Br. at 9. WHW maintains that the Commission "implicitly decided that WHW had an LEO in 2002. . . . If WHW had not had an LEO, in other words, the Commission should never have accepted the petition and never should have granted WHW a rate that was based (in theory) on current avoided costs. By choosing to take and set a contract rate in docket D2002.8.100, the Commission clearly indicated that WHW had a legally enforceable obligation to deliver its output to NWE." Opening Br. at 9-10.

9. WHW cited cases from three states to support its contention that its conclusion that an LEO existed is correct. WHW quoted from a Pennsylvania case as follows:

> These cases are sensible and persuasive . . . Where a QF has done everything within its power to create an obligation, either by tendering a contract to the utility or by petitioning the PUC to approve a contract or to compel a purchase, and only an act of acceptance by the utility or an act of approval by the PUC remains to establish the existence of a "contract", then the "legally enforceable obligation" contemplated by § 292.304(d)(2) has been created, and the QF is entitled to rates based on avoided costs calculated from the date of the QF's action.

*Armco Advanced Materials Corp. v. Pennsylvania Pub. Util. Comm'n*, 579 A.2d 1337 (1990). Opening Br. at 10

10. WHW cited an Oregon case for the proposition that an " occurred after negotiations had broken down, and as of the date the Oregon Public Utility Commission's order fixing the avoided cost rate. *Snow Mountain Pine Co. v. Mauldin*, 734 P.2d 1366 (1987). *Id.*

11. WHW cited an Idaho case to demonstrate "an LEO required a signed contract or a meritorious complaint with the Commission alleging mature project ready to perform. *A.W. Brown v. Idaho Power Co.* 828 P.2d 841 (1992). *Id.*

12. Arguing that it would be unfair to set rates based on 2002 avoided costs because of the delay caused by litigation, WHW asserted that it "is entitled to a contract that will be in place for a term of 20 years at a rate based on avoided costs projected forward to the date power will be delivered." Opening Br. at 11.

13.      WHW describes the origin of the term legally enforceable obligation, illustrates that LEO refers to an obligation of a QF, and quotes FERC Order 69 for the proposition that LEO "intended to prevent a utility from circumventing the requirement that provides a capacity credit for an eligible qualifying facility merely by refusing to enter into a contract with the qualifying facility." Opening Br. at 12.

14.      WHW asserts that a "QF does not need to show an immediate ability to produce power or commence sales in order to have an LEO; rather the LEO occurs when the QF has agreed to obligate itself to deliver at a further [sic] date energy and capacity to the electric utility." Opening Br. at 13, quoting 45 Fed. Red. 12214, 12224 (1980) (the word "further" is "future" in the original).

15.      WHW noted that ARM 38.5.1902(5) requires QFs with a capacity greater than 10 MW to be selected in a competitive solicitation in order to receive a long term contract and entitles such QFs to a short-term rate between competitive solicitations. Open Br. at 14. WHW argued that these provisions of ARM 38.5.1902(5) are incompatible with §§ 69-3-203 and 69-3-604, MCA. Opening Br. at 14. WHW asserted that "Application of a short-term rate pursuant to ARM 38.5.1902(5) is inherently biased against QFs because (1) no QF can obtain financing with a short term rate; (2) the rates are not and have not been updated to reflect NWE's actual avoided costs (as of 2002, or even today)[;] and [(]3) NWE has not conducted any competitive solicitation process for QFs." Opening Br. at 14.

16.      WHW repeated its positions, "The Commission should therefore also offer a rate based on avoided costs calculated now. WHW expects the Commission will need to supplement its administrative record with the avoided cost data in order to set these rates." Opening Br. at 17.

**NWE Response Brief**

17.      NWE recited the procedural background of this Docket and related court proceedings and described the factual background. Resp. Br. at 1-8. NWE asserted that WHW was a proposed facility that would be built only if Navitas could obtain financing. Resp. Br. at 5-6.

18.    NWE asserts that to have an LEO, a QF must have obligated itself to deliver energy to a utility. Resp. Br. at 8. NWE argues that WHW has never legally obligated itself to provide energy to NWE. *Id.*

19.    NWE counters WHW's citation to *Armco Advanced Materials Corp. v. Pennsylvania Pub. Util. Comm'n*, 579 A.2d 1337 (1990), by quoting the next sentence of the opinion as:

> However the "legally enforceable obligation" we have just described does not exist at a time during "serious negotiations" between the parties (whether at the time of agreement in principle on price or otherwise) when the QF has not yet obligated itself to deliver power and remains free to walk away from the negotiations without liability.

Resp. Br. at 9, quoting 579 A.2d at 1347. Based on this sentence, NWE argues that "the appropriate legal standard used in *Armco* is not the mere tendering of a contract or the petitioning to a state utility commission, as suggested by WHW, but is when the QF has obligated itself to deliver power to the utility." Resp. Br. at 9. NWE also asserted that in *Armco* the utility and the QF had executed an agreement for the purchase of capacity and energy.

20.    NWE also disputes WHW's representation of *Snow Mountain Pine Co. v. Mauldin*, 734 P.2d 1366 (1987). Resp. Br. at 10. NWE argued that the *Snow Mountain Pine Co.* court "concluded that the determinative factor for establishing the LEO . . . was 'the date on which a binding obligation first exists to deliver energy.'" *Id.* NWE quoted the *Snow Mountain Pine Co. court*:

> Thus, the regulations and administrative rules contemplated that a qualifying facility's self-imposed obligation to *deliver energy* triggers a utility's obligation to *purchase energy*. The date on which the qualifying facility obligated itself to deliver energy fixes the date on which the "avoided costs' are determined.

Resp. Br. at 10 quoting 734 P.2d at 1371.

21.    NWE concedes that WHW's representation of *A.W. Brown v. Idaho Power Co.* 828 P.2d 841 (1992) is "somewhat accurate" and asserts that the case "does nothing to support [WHW's] position that an LEO occurred or has occurred for its project." Resp. Br. at 11. NWE asserts that the facts show WHW had never had a "signed contract" or a "mature project ready to perform." NWE also asserts that the *A.W. Brown* court "upheld the Idaho Public Utility Commission's conclusion that the determinative factor in establishing an LEO is:

> . . . that *a qualifying facility is entitled to receive avoided costs rates if it obligates itself to the delivery of energy* or capacity and if that obligation is legally enforceable against the qualifying facility. *This is the essence of the relationship between a qualifying facility and the utility: the utility must pay avoided costs, but in return the utility is entitled to know that the facility is obligated to deliver capacity and energy and that the obligation is legally enforceable.*"

Resp. Br. at 11, quoting 828 P.2d at 847 (emphasis in original).

22.     NWE compared the facts in this Docket to cases from Idaho, Pennsylvania, and New Hampshire to argue that WHW did not have an LEO. NWE stated "the Idaho Supreme Court again upheld an Idaho PUC's decision to dismiss a claim made by a QF that an LEO existed and that the QF was entitled to a specific public utility rate in effect at the time because the QF had not begun to design or build its facility nor had the QF provided the utility with any concrete facts related to the proposed generation facility." Resp. Br. at 12, citing *Empire Lumber v. Washington Water Power*, 755 P.2d 1229, 1231-32 (Idaho 1987) (adhered to on rehearing).

23.     NWE asserted that *South River Power Partners, LP v. Pennsylvania PUC*, 696 A.2d 926 (Pa. 1996), was similar in that the court upheld a decision by the Pennsylvania PUC that a QF did not incur an LEO when the QF "had done nothing more than tender a contract to [a utility] and file a petition with the PUC. Resp. Br at 12, quoting 696 A.2d at 932. NWE argued that WHW was in the same position as South River Power Partners, LP.

24.     NWE asserted that in New Hampshire an LEO is created when a QF filed a petition accompanied by a signed interconnection agreement with the PUC, and demonstrated that most of the development problems had been resolved. Resp. Br. at 12-13, citing *Appeal of Public Service Co. of New Hampshire*, 539 A.2d 275 (N.H. 1988). NWE argued that WHW would not meet the New Hampshire test because it had not signed an interconnection agreement or done anything to show that its project is anything more than a paper project. Resp. Br. at 12.

25.     NWE reviewed FERC Order 69, emphasized that the paragraph creating LEO language requires a QF to have "agreed to obligate itself to deliver at a future date energy and capacity to the electric utility," and argued that "WHW has not agreed to obligate itself to deliver at a future date energy to [NWE]." Resp. Br. at 14-15.

26.     Finally, NWE argued that, absent an LEO, a rate for WHW should be consistent with current approved QF tariffs and reflective of NWE's avoided costs. Resp. Br. at 16.

DOCKET NO. D2002.8.100, ORDER NO. 6444e                                              7

**WHW Reply Brief**

     27.    WHW asserts that NWE's Response Brief contradicts the law governing QFs and mischaracterizes the facts concerning WHW. Reply Br. at 1. WHW states that "NWE erroneously argues that [an obligation to deliver energy and capacity] only arises when the QF is immediately capable of delivering energy and capacity through an 'existing' (i.e. built and connected) project and has obligated itself to deliver power through a legally binding contract from which it cannot 'walk away.' In fact, according to both the case law from other jurisdictions and the bounds of common sense, neither of these factors are conditions precedent to establishing an LEO." Reply Br. at 2.

     28.    WHW asserts that it incurred an LEO in 2002. WHW argues that FERC agrees that a QF "can acquire an LEO and bind itself to a performance obligation (to deliver energy and capacity to the utility) by filing a petition with the state utility commission." Reply Br. at 3, quoting *JD Wind 1, LLC*, 129 FERC ¶ 61,148, ¶ 61,633 (November 19, 2009). WHW repeats its argument that its LEO was "established when it petitioned the Commission for a determination of a contract rate." Reply Br. at 4.

     29.    WHW argues that its status as a proposed project is not relevant and that an ability to deliver power immediately is not a condition precedent for an LEO. Reply Br. at 5. Analyzing *A.W. Brown* and *Empire Lumber*, WHW asserts that it is a "mature project" because it had collected over a year of wind data, was negotiating a land lease, was contracting for avian and environmental impact studies, and had established its proposed power and capacity at 50 MW. Reply Br. at 6.[2]

     30.    WHW argues that it is not similar to South River Power, LP. Reply Br. at 7. WHW also argues that the Commission has not imposed filing requirements similar to those imposed by the New Hampshire PUC, and that there is no reason to think WHW would have been unable to meet such requirements. *Id.*

     31.    WHW argues that a signed contract or other legally binding document is not a condition precedent for an LEO. Reply Br at 8-11.

---

[2] WHW filed as Exhibit 4 to its Reply Brief the Affidavit of Christopher Moore. This Affidavit has not been subject to challenge or rebuttal by NWE. Mr. Moore has not been subject to cross-examination on the facts to which he sears. The Commission does not approve of this gamesmanship and attempt to introduce new evidence through a Reply Brief on discrete factual and legal issue. The Commission declines to consider Mr. Moore's Affidavit.

32.     WHW maintains that even without an LEO, the Commission must set a contract rate for a long-term contract. Reply Br. at 11-12. WHW asserts that the District court declared a short-term proxy for a contract to be unreasonable and unlawful. Reply Br. at 12.

**Analysis and Findings**

**Legally Enforceable Obligation**

33.     PURPA was enacted in 1978 to combat the nationwide energy crisis. *FERC v. Mississippi*, 456 U.S. 742, 745 (1982). Section 210 of PURPA required FERC to adopt rules that required electric utilities to purchase electric energy from QFs and required state regulatory authorities to implement the rules adopted by FERC. 16 U.S.C. § 824a-3. A state regulatory authority may comply with the statutory requirements by issuing regulations, by resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules. *Mississippi*, 456 U.S. at 751.

34.     FERC rules provide that a QF may deliver energy and/or capacity to a utility pursuant to a contract, a non-contract LEO, or on an as available basis. 16 C.F.R. § 292.304. If the QF and utility have entered into a contract, the contract establishes the rate for purchases by the utility. 16 C.F.R. § 292.301(b). If the QF provides energy or capacity pursuant to a non-contract LEO for the delivery of energy or capacity over a specified term, the QF has the option, which must be exercised prior to the beginning of the specified term, to choose a rate based on the utility's avoided cost at the time of delivery or at the time the LEO is incurred. 16 C.F.R. § 292.304(d)(2). If the QF provides energy on an as available basis, the QF is entitled to a rate based on the utility's avoided costs at the time of delivery. 16 C.F.R. § 292.304(d)(1). Therefore, the existence or non-existence of an LEO on the part of WHW is critical.

35.     FERC has stated, "It is up to the States, not [FERC], to determine the specific parameters of individual QF power purchase agreements, including the date at which a legally enforceable obligation is incurred under State law." *Metropolitan Edison Co.*, 72 FERC ¶61,015, ¶ 61,050 (July 6, 1995). Determining the date at which an LEO is incurred requires determining what establishes an LEO under state law. This is a matter of first impression for the Commission.

36.     Other states have taken a broad range of positions on what establishes an LEO. In Texas, an LEO arises when a QF notifies a utility that energy will be available within 90 days if

the utility has sufficient interconnection facilities available. Tex. PUC Subst. R. 25.242(f)(1)(B). A QF claimed that this restrictive 90-day rule "eviscerates the LEO for unbuilt QFs, because a new facility cannot be financed and constructed in only 90 days" and that "denying unbuilt QFs the opportunity to lock-in a purchase rate prior to construction of the facility . . . denies unbuilt QFs their right to LEOs under PURPA." *Power Resources Group, Inc. v. Public Util. Comm'n of Texas*, 422 F.3d 231, 238 (5ᵗʰ Cir. 2005). The court held the rule to be valid. 422 F.3d at 239.

37.     Although the parties discussed the Oregon *Snow Mountain Pine Co.* case, neither of them indicated the case was no longer good law in Oregon. The Oregon PUC modified the standard for creating an LEO by administrative rule. The Oregon PUC defines the time an obligation to purchase the energy or capacity is incurred as the earlier of "(a) the date on which a binding written obligation is entered into between a qualifying facility and a public utility to deliver energy, capacity, or energy and capacity; or (b) the date agreed to, in writing, by the qualifying facility and the electric utility as the date the obligation is incurred for the purposes of calculating the applicable rate." Or. Admin. R. 860-029-0010(29). In a challenge to a utility's interpretation of the rule based on *Snow Mountain Pine Co.* and a contention that QFs would be left without recourse, the PUC upheld its validity. *International Paper Co. v. PacifiCorp*, UM 1449, Order No. 09-439, 2009 Ore. PUC LEXIS 374 (November 4, 2009).

38.     In Idaho, the requirements for an LEO have been developed and refined by the PUC. The language from *A.W. Brown Co.* quoted by the parties is actually a quote from the PUC's August 22, 1990 decision on A.W. Brown Co.'s complaint. *See A.W. Brown Co.*, 828 P.2d at 844 and 847. In *A.W. Brown Co.*, the court described a PUC order regarding meritorious as "in order to be meritorious a complainant must allege and prove (1) that the project was substantially mature to the extent the developer was ready, willing, and able to sign a contract and (2) that the developer had actively negotiated for a contract which, but for the reluctance of the utility, would have been executed." 828 P.2d at 843.

39.     In Idaho, a QF does not establish an LEO by seeking information in order to assess the viability of a project. *In the Matter of the Enforceability of IPUC Order Nos. 25454, 25706, and 25787*, 951 P.2d 521, 526 (Idaho 1997). A utility offered to purchase the output of a QF at specified rates; the QF responded that "although the . . . rates were substantially less than

[it] believed were appropriate, [it] was willing to take a contract with complete terms to its fuel suppliers, financiers, and vendors to determine whether the contract would support a project." 951 P.2d at 524. The PUC and the court held that the QF did not incur an LEO. 951 P.2d at 525. Similarly, a non-binding contract right to sell power at a fixed avoided cost is not an LEO. *Rosebud Enterprises, Inc. v. Public Util. Comm'n*, 917 P.2d 766, 777 (Idaho 1996).

40.     In New Hampshire, the PUC's policy is that the filing of a timely and eligible rate petition accompanied by an interconnection agreement signed by a QF creates an LEO. *Appeal of Public Service Co. of New Hampshire*, 539 A.2d 275, 280 (N.H. 1988). A timely petition is one that demonstrates that most of the developmental problems have been resolved, giving rise to a reasonable expectation that the project will be on-line on the date specified in the petition. 529 A.2d at 281. An eligible rate petition demonstrates that the project is viable over the term of the rate obligation. *Id.*

41.     Similarly, in Oklahoma a QF must demonstrate that a project is viable. *Public Service Co. of Oklahoma v. Drew*, 115 P.3d 861, 873 (Okla. 2005). The Oklahoma Corporation Commission found a QF that had attempted to obtain environmental and other necessary permits and had executed contracts for (1) natural gas supply and transportation, (2) construction of the facility, and (3) operation and maintenance of the project, had demonstrated its viability. *Id.* A QF that did not present a contract that obligated it to deliver power, had not obtained a contract for construction, operation and maintenance of the project, and had not obtained a contract for natural gas was found not to have demonstrated the viability of the project or have incurred an LEO. *Smith Cogeneration Mgmt. v. Corporation Comm'n*, 863 P.2d 1227, 1234 (Okla. 1993).

42.     The requirements for an LEO in Pennsylvania as established by the cases cited by the parties and other cases can be described as follows: A viable QF that has done everything within its power to create an obligation, has obligated itself to deliver power, and cannot abandon the project without liability has incurred an LEO. *See, South River Power Partners, LP v. Public Util. Comm'n*, 696 A.2d 926 (Pa. Commonw. Ct.1997); *Pennsylvania Electric Co. v. Public Util. Comm'n*, 677 A. 2d 831 (Pa. 1996); *Pennsylvania Electric Co. v. Public Util. Comm'n*, 648 A.2d 63 (Pa. Commonw. Ct. 1994); *Armco Advance Materials Corp. v. Public Util. Comm'n*, 579 A.2d 1337 (Pa. Commonw. Ct. 1990).

43.    The above paragraphs demonstrate the range of requirements that various states have adopted in determining what constitutes an LEO.  The Commission must determine what constitutes an LEO in Montana.

44.    WHW asserts that the Commission has already determined that WHW had incurred an LEO by issuing Order No. 6444c.  WHW's characterization of the effect of Order 6444c on the LEO issue is wrong.  In Order 6444c, the Commission merely ruled that WHW was entitled to a tariff rate pursuant to administrative rule.  ARM 38.5.1902(5) provides that QFs larger than 10 MW are entitled to the short-term avoided cost tariff approved by the Commission or a negotiated short-term contract.  Order 6444c implements the prior version of this rule.  Neither the current version, nor the prior version, conditions a QFs ability to receive the short-term rate on the existence of an LEO.

45.    Upon review of the statutes and their implementation by our sister states, the Commission is persuaded that the touchstone of a legally enforceable obligation or LEO is an absolute, unconditional commitment to deliver energy, capacity, or energy and capacity at a future date.  Any commitment that is conditional fails to establish an LEO.  This does not mean that a QF must show an immediate ability to deliver electric power.

46.    After reviewing the litigation in this Docket and in other jurisdictions, the Commission is convinced that the interests of ratepayers, QFs, and utilities are best served by a bright line test for establishment of an LEO.  Such a test will remove uncertainty on the part of QFs and utilities as to the existence of an LEO.  Such a test will properly balance the interests of QFs in furthering their projects while protecting ratepayers from uneconomic projects.  A bright line test should also minimize litigation of this issue before the Commission and conserve scarce Commission resources.

47.    To establish an LEO, a QF must tender an executed power purchase agreement to the utility with a price term consistent with the utility's avoided costs, with specified beginning and ending dates, and with sufficient guarantees to ensure performance during the term of the contract, and an executed interconnection agreement.  The executed contract demonstrates an unconditional commitment.  If the utility also executes the contract, the utility would be able to enforce the obligations undertaken by the QF.  Interconnection expenses may be so high as to derail an otherwise feasible project.  Only by acknowledging and agreeing to an interconnection

agreement can a QF demonstrate that it is prepared to proceed despite any interconnection obstacles. Further, an interconnection agreement requires that a QF have sufficiently defined its project and made adequate progress that the project would be more than a mere speculative, paper proposal.

48.     These requirements are not as restrictive as Texas which essentially requires a project to have been completed, nor as permissive as some other states. The Commission believes that these requirements represent the proper balance between the various interests and will serve to encourage economical QFs without exposing ratepayers to undue risk or costs.

49.     The above bright line test will be applied prospectively only. For QFs, such as WHW, that have pending petitions for rates that depend on an LEO, the Commission will examine the totality of the circumstances to determine if the QF has made an unconditional commitment to deliver energy, capacity or energy and capacity.

**Validity of ARM 38.5.1902(5)**

50.     WHW has asserted that ARM 38.5.1902(5), which requires a QF larger than 10 MW to be selected in a competitive solicitation to receive a long term contract and provides for a short term rate when not selected, is contrary to §69-3-604, MCA, in that it does not encourage long term contracts for the purchase of electricity. WHW also asserted that the Court found ARM 38.5.1902(5) to be unreasonable and unlawful. The Commission disagrees. The Court found that reliance on a stale tariff that did not reflect avoided costs was unreasonable and unlawful, not that the rule was invalid. The Commission has addressed the concern of the court by requiring NWE to update the tariff and to make more frequent and timely tariff filings.

51.     All federal and state laws with respect to QFs attempt to strike a delicate balance between encouraging QF development and ratepayer indifference. Many states require QFs to participate in competitive solicitations to establish avoided costs. Experience has demonstrated that actual competing proposals are the most accurate method of determining long-term avoided costs. ARM 38.5.1902(5) represents a reasonable and permissible balancing of the interests of QFs and ratepayers in that it leads to more accurate estimation of long term avoided costs while allowing QFs to sell at short term rates pending selection in a competitive solicitation.

52.     The Commission will entertain petitions from QFs seeking a short term rate other than the tariff rate if the QF alleges and shows that the tariff rate does not reflect the utility's

short term avoided costs due to the passage of time or other changed circumstances since the Commission approved the tariff rate. A QF seeking a short term rate need not demonstrate that it has incurred a legally enforceable obligation.

53.     The Commission will entertain petitions from QFs that have incurred a legally enforceable obligation for long term rates if the QF alleges and shows irregularities in the competitive solicitation process or the resource procurement process that discriminate against QFs.

**Application to Whitehall Wind**

54.     The record establishes that WHW proposed a wind project to be located near the Whitehall, Montana. C. Moore Pre-filed Testimony, Ex. 2, Attachment 1 – Turbine Site Maps. WHW attempted to negotiate with NWE for a power purchase agreement but was unable to reach any agreement. WHW petitioned the Commission to set a rate and terms for a power purchase agreement.

55.     WHW intended to use the rate set by the Commission to determine if WHW could proceed with the project. As Mr. Jaunich testified, "I think price is a factor because it determines whether or not Whitehall Wind can proceed in building a facility in Montana, and whether it's economic for us to do so. Tr. at p. 46, ll. 12-15. Similarly, Mr. Jaunich described the future process after determination of a price as, "We would finance this project internally. So we would take the actual price terms that was [sic] established by this Commission, run our economic model, see if it met the commensurate rate of return, present that internally to our utility – not utility – but our parent company, and they would in turn then say, 'This is an economic venture. We can do it,' and can move forward in the process." Tr. at p. 47, ll. 15-22.

56.     WHW submitted an unsigned contract to NWE. According to Mr. Jaunich, "We've also submitted a contract that has certain terms and conditions in it, and that wasn't meant to be a set agreement. It meant to stimulate negotiations between us and the utility." Tr. at p. 76, ll. 12-15.

57.     The wind analysis performed by WHW consisted of correlating a wind atlas that has wind speeds at airports in the area as supplemented with NREL data for the state of Montana. Tr. at p. 93, l. 23 – p. 94, 6. WHW had not conducted any avian studies at the site. Tr. at p. 97,

l. 10. The record does not indicate that WHW had actually obtained any site control of the proposed areas for the project.

58.     Taken as a whole, the record establishes that WHW was merely seeking information from which it could make a decision whether or not to proceed. This falls short of establishing an LEO. *Acccord In the Matter of the Enforceability of IPUC Order Nos. 25454, 25706, and 25787*, 951 P.2d at 526.

59.     WHW has not incurred an LEO. As such it is only entitled to rates based on avoided costs determined at the time of delivery. Nothing in statute, administrative rule, or prior Commission decisions provides WHW an absolute right to a fixed rate for a 20 year contract. The best estimate of NWE's avoided costs at time of delivery is market prices at time of delivery. Order No. 6973d in Docket D2008.12.146, issued on May 6, 2010, made two market based rate options available to QFs larger than 10 MWs between competitive solicitations. WHW is entitled to choose either of those rates.

### CONCLUSIONS OF LAW

1.     All findings of fact that are properly conclusions of law are incorporated herein and adopted as such.

2.     The Commission has provided adequate public notice of all proceedings, and an opportunity to be heard to all interested parties in this docket. § 69-3-104, MCA.

3.     The Commission supervises, regulates, and controls public utilities pursuant to Title 69, Chapter 3, MCA. § 69-3-102, MCA.

4.     The Commission implements and enforces PURPA. 16 U.S.C. § 824a-3.

5.     NorthWestern Energy is a public utility subject to the jurisdiction of the Commission. § 69-3-101, MCA.

6.     Whitehall Wind, LLC is a proposed qualifying facility entitled to rates based on NWE's avoided costs determined at the time of delivery. 18 C.F.R. § 292.304(d)(1).

7.     Rate Options 2(a) and 2(b) in Order No. 6973d in Docket D2008.12.146 provide a method for determining NWE's avoided costs at the time of delivery.

DOCKET NO. D2002.8.100, ORDER NO. 6444e                                          15

## ORDER

IT IS HEREBY ORDERED that Whitehall Wind, LLC, is entitled to choose Rate Option 2(a) or Rate Option 2(b) established by the Commission in Docket No. D2008.12.146, Order No. 6973d, ¶¶ 139 – 143.

DONE IN OPEN SESSION this 18th day of May, 2010, by a vote of 5-0.

DOCKET NO. D2002.8.100, ORDER NO. 6444e        16

BY ORDER OF THE MONTANA PUBLIC SERVICE COMMISSION


_____
GREG JERGESON, Chair


_____
KEN TOOLE, Vice Chair


_____
GAIL GUTSCHE, Commissioner


_____
BRAD MOLNAR, Commissioner


_____
JOHN VINCENT, Commissioner

ATTEST:


Verna Stewart
Commission Secretary


(SEAL)


NOTE:         Any interested party may request the Commission to reconsider this decision. A motion to reconsider must be filed within ten days. <u>See</u> 38.2.4806, ARM.